IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, AND THE STATE OF INDIANA, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:22-cv-00303 |
| HERITAGE-CRYSTAL CLEAN, LLC | ) ) ) ) | |
| Defendant. | ) ) | |

_____

## COMPLAINT

Plaintiffs, the United States of America, by and through the Attorney General of the United States, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"); the Louisiana Department of Environmental Quality ("LDEQ"); and the state of Indiana, by and through the Attorney General of Indiana, acting at the request of and on behalf of the Commissioner of the Indiana Department of Environmental Management ("IDEM"), file this Complaint and allege as follows:

## NATURE OF THIS ACTION

1. This is a civil action brought against Heritage-Crystal Clean, LLC ("HCC" or "Defendant") by Plaintiffs pursuant to Sections 3008(a) and (g) of the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. § 6928(a) and (g), La. R.S. 30:2025, and Indiana Code Section 13-30-4-1. In this action, Plaintiffs seek injunctive relief and civil penalties for violations of regulations that are part of federally authorized and federally enforceable hazardous waste management programs applicable to facilities owned or operated by HCC at

various locations around the country. The state of Indiana also seeks injunctive relief and civil penalties for violation of terms and conditions of a solid waste processing facility permit and violation of applicable state regulations that prohibit solid waste processing facilities from accepting hazardous waste.

2.      As set forth below, Defendant has violated the statutory and regulatory requirements applicable to the management and disposal of solid and hazardous waste found in Title 33 of the Louisiana Administrative Code ("LAC") Part V, Chapters 1 through 51; Title 329, Article 3.1 of the Indiana Administrative Code ("IAC"), which incorporates specified provisions of 40 C.F.R. Parts 260–270 (2008) by reference; Title 6 of the Code of Colorado Regulations ("CCR"), Section 1007-3, Parts 100, 260–279 (2012); Ga. Comp. R. and Regs. 391-3-11 (2016), which incorporates specified provisions of 40 C.F.R. Parts 260–279 (2016) by reference; Title 25 of the Pennsylvania Code ("Pa. Code"), which incorporates specified provisions of 40 C.F.R. Parts 260–270 (2005) by reference; Section 3005 of RCRA, 42 U.S.C. § 6925; La. R.S. 30:2183; and Indiana Code Section 13-30-2-1 (10).

## PARTIES

3.      Plaintiffs are the United States of America, the Louisiana Department of Environmental Quality, and the state of Indiana, on behalf of Indiana Department of Environmental Management.

4.      Defendant is HCC, a limited liability company organized under the laws of the state of Indiana. HCC's corporate headquarters is in Elgin, Illinois. HCC is registered to do business in numerous states, including Indiana, Louisiana, Colorado, Georgia, and Pennsylvania.

5.      HCC is a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15); LAC 33:V.109 (2014); 329 IAC 3.1-4-20 (2010) and 40 C.F.R. § 260.10 (2008), which is incorporated by reference in 329 IAC 3.1-4-1 (2010); 6 CCR 1007-3 § 260.10 (2012);

40 C.F.R. § 260.10 (2016), which is incorporated by reference in Ga. Comp. R. and Regs. 391-3-11.02(1) (2016); and 40 C.F.R. § 260.10 (2005), which is incorporated by reference in 25 Pa. Code § 260a.1 (2005).

## JURISDICTION, VENUE, AUTHORITY AND NOTICE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and RCRA Sections 3008(a) and (g), 42 U.S.C. §§ 6928(a) and (g). Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over all claims asserted in this complaint by LDEQ and Indiana under state law because such claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and RCRA Section 3008(a)(1), 42 U.S.C. § 6928(a)(1), because Defendant resides and is found within this district within the meaning of 28 U.S.C. §§ 1391(b) and 1395(a).

8. Authority to bring this civil action on behalf of EPA is vested in the Attorney General of the United States pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 516 and 519.

9. Authority to bring this civil action on behalf of EPA is vested in LDEQ under La. R.S. 36:231 with the concurrence of the Attorney General of the state of Louisiana, at the request of the Secretary of the LDEQ pursuant to La. R.S. 30:2025, La. R.S. 30:2050.7, and LAC 33:V.107.

10. The Indiana Attorney General is authorized to appear and represent Indiana and IDEM in this case pursuant to Indiana Code Sections 4-6-3-2(a) and 13-14-2-6.

Complaint

Page 3

U.S, IN, & LDEQ v. Heritage-Crystal Clean, LLC,
Civil Action No. 1:22-cv-00303 (N.D. Il.)

11.     IDEM may proceed in court, by appropriate action, to procure or secure compliance with Title 13 of the Indiana Code or any other law that IDEM has the duty or power to enforce, pursuant to Indiana Code Section 13-14-2-6 (3).

12.     IDEM may proceed in court, by appropriate action, to procure compliance with any standard or rule of the board pursuant to Indiana Code Section 13-14-2-6 (4).

13.     IDEM may recover a civil penalty for violations of environmental laws, rules or permits in a civil action commenced in any court with jurisdiction pursuant to Indiana Code Section 13-30-4-1(b).

14.     The United States provided notice to the States of Louisiana, Indiana, Colorado, Georgia, and the  Commonwealth of Pennsylvania prior to the commencement of this action in accordance with RCRA Section 3008(a)(2), 42 U.S.C. § 6928(a)(2).

## STATUTORY AND REGULATORY BACKGROUND

15.     Subtitle III chapter C of RCRA (RCRA §§ 3001-3024, 42 U.S.C. §§ 6921-6939g, commonly referred to as "Subtitle C") establishes a "cradle-to-grave" program for regulating the generation, transportation, treatment, storage, and disposal of hazardous waste. See 42 U.S.C. § 6901 *et seq*. Section 3014 of RCRA, 42 U.S.C. § 6935, which is also part of Subtitle C, also establishes a program for regulating used oil that is recycled.

16.     Section 3001 of RCRA, 42 U.S.C. § 6921, authorizes the Administrator of EPA ("Administrator") to promulgate regulations identifying characteristics of hazardous waste and listing hazardous wastes.

17.     Pursuant to the authority under Section 3001 of RCRA, 42 U.S.C. § 6921, the Administrator has promulgated regulations identifying and listing hazardous wastes that are subject to regulation under Subtitle C of RCRA. These regulations are codified at 40 C.F.R. Part

Complaint

Page 4

U.S, IN, & LDEQ v. Heritage-Crystal Clean, LLC,
Civil Action No. 1:22-cv-00303 (N.D. Il.)

261, and include regulations identifying hazardous waste characteristics (40 C.F.R. §§ 261.20–261.24) as well as regulations listing particular hazardous wastes (40 C.F.R. §§ 261.30–261.35).

18.     Section 3002 of RCRA, 42 U.S.C. § 6922, authorizes the Administrator to promulgate regulations establishing standards applicable to generators of hazardous waste identified or listed under 40 C.F.R. Part 261.

19.     Pursuant to the authority under Section 3002 of RCRA, 42 U.S.C. § 6922, the Administrator has promulgated regulations establishing standards applicable to generators of hazardous waste. These regulations are codified principally at 40 C.F.R. Part 262.

20.     Section 3003 of RCRA, 42 U.S.C. § 6923, authorizes the Administrator to promulgate regulations establishing standards applicable to transporters of hazardous waste identified or listed under 40 C.F.R. Part 261.

21.     Pursuant to the authority under Section 3003 of RCRA, 42 U.S.C. § 6923, the Administrator has promulgated regulations establishing standards applicable to transporters of hazardous waste. These regulations are codified at 40 C.F.R. Part 263.

22.     Section 3004 of RCRA, 42 U.S.C. § 6924, authorizes the Administrator to promulgate regulations establishing standards applicable to facilities that treat, store or dispose of hazardous waste identified or listed under 40 C.F.R. Part 261.

23.     Pursuant to the authority under Section 3004 of RCRA, 42 U.S.C. § 6924, the Administrator has promulgated regulations establishing standards applicable to facilities that treat, store or dispose of hazardous waste identified or listed under 40 C.F.R. Part 261, including regulations codified at 40 C.F.R. Parts 264 and 265.

24.     Section 3005 of RCRA, 42 U.S.C. § 6925, authorizes the Administrator to promulgate regulations requiring each person owning or operating a hazardous waste treatment,

storage or disposal facility to have a permit or to have interim status in accordance with RCRA Section 3005(e).

25.     Pursuant to the authority under Section 3005 of RCRA, 42 U.S.C. § 6925, the Administrator has promulgated regulations governing the issuance of permits for facilities that treat, store or dispose of hazardous waste. These regulations are codified at 40 C.F.R. Part 270.

26.     Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, any state may apply to the Administrator for authorization to administer and enforce a hazardous waste management program under RCRA Subtitle C in such state. Under Section 3006 of RCRA, 42 U.S.C. § 6926, the Administrator may authorize such state to administer a state hazardous waste management program in lieu of the federal hazardous waste management program if the Administrator determines the state hazardous waste management program is at least equivalent to and consistent with the federal program and provides adequate enforcement authority. The provisions of Section 3006 of RCRA, 42 U.S.C. § 6926, regarding state programs are also applicable to state programs for management of used oil not listed or identified as a hazardous waste. 42 U.S.C. § 6926(h).

27.     Pursuant to the authority under Section 3006 of RCRA, 42 U.S.C. § 6926, the Administrator has authorized the state of Louisiana to operate a state hazardous waste management program and a program for management of used oil in that state in lieu of the federal programs for management of hazardous waste and used oil that is recycled. The federally authorized programs for managing hazardous waste and used oil in Louisiana are codified at LAC 33:V.Chapters 1 - 51 (2015).

28.     Pursuant to the authority under Section 3006 of RCRA, 42 U.S.C. § 6926, the Administrator has authorized the state of Indiana to operate a state hazardous waste management

program in that state in lieu of the federal hazardous waste management program. The hazardous waste management program that is currently federally authorized in Indiana is codified at 329 IAC Art. 3.1 (2010). The authorized state hazardous waste management program for Indiana incorporates by reference specified requirements of 40 C.F.R. Parts 260–270 (2008), including each of the federal regulations identified in allegations below relating to HCC activities and facilities located in Indiana. Therefore, to the extent that provisions of the Code of Federal Regulations have been incorporated by reference into Indiana's federally authorized hazardous waste management program, allegations in this complaint relating to HCC activities and facilities in Indiana will refer directly to the incorporated provisions of the Code of Federal Regulations.

29.     Pursuant to the authority under Section 3006 of RCRA, 42 U.S.C. § 6926, the Administrator has authorized the state of Colorado to operate a state hazardous waste management program in that state in lieu of the federal hazardous waste management program. The hazardous waste management program that is currently federally authorized in Colorado is codified at 6 CCR 1007-3, Parts 100, 260 – 279 (2012).

30.     Pursuant to the authority under Section 3006 of RCRA, 42 U.S.C. § 6926, the Administrator has authorized the state of Georgia to operate a state hazardous waste management program in that state in lieu of the federal hazardous waste management program. The federally authorized hazardous waste program for Georgia is codified at Ga. Code Ann. §§ 12-8-60 to 12-8-83 and Ga. Comp. R. and Regs. 391-3-11. At times relevant to this complaint, the authorized state hazardous waste management program for Georgia has incorporated by reference specified requirements of 40 C.F.R. Parts 260–279 (2016), including each of the federal regulations identified in allegations below relating to HCC activities and facilities located in Georgia. Effective February 22, 2019, the federally authorized hazardous waste management

Complaint

Page 7

U.S, IN, & LDEQ v. Heritage-Crystal Clean, LLC,
Civil Action No. 1:22-cv-00303 (N.D. Il.)

program for Georgia incorporated by reference certain revisions to previously incorporated federal regulations, including specified provisions of 40 C.F.R. Part 262 (2017). Therefore, to the extent that provisions of the Code of Federal Regulations have been incorporated by reference into Georgia's federally authorized hazardous waste management program, allegations in this complaint relating to HCC activities and facilities in Georgia will refer directly to the incorporated provisions of the Code of Federal Regulations.

31.     Pursuant to the authority under Section 3006 of RCRA, 42 U.S.C. § 6926, the Administrator has authorized the state of Pennsylvania to operate a state hazardous waste management program in that state in lieu of the federal hazardous waste management program. The hazardous waste management program that is currently federally authorized in Pennsylvania is codified at 25 Pa. Code Chapters 260a-266a, 266b, and 268a-270a (2009). The authorized state hazardous waste management program for Pennsylvania incorporates by reference specified requirements of 40 C.F.R. Parts 260–279 (2005), including each of the federal regulations identified in allegations relating to HCC activities and facilities located in Pennsylvania. Therefore, allegations in this complaint relating to HCC activities and facilities in Pennsylvania will refer directly to provisions of the Code of Federal Regulations that have been incorporated into Pennsylvania's federally authorized hazardous waste management program, where applicable.

32.     Pursuant to Subchapter IV of RCRA, §§ 4001 *et seq.*, 42 U.S.C. §§ 6941 *et seq.* (commonly referred to as "Subtitle D"), states were required to develop and implement plans, including establishment of regulatory authority, to provide for resource conservation and recovery, including practices as may be necessary to use or dispose of solid wastes in a manner that is environmentally sound.

33.     Pursuant to Title 13, Article 13, Chapter 8 of the Indiana Code, the Environmental Rules Board is established to adopt rules that are consistent with the purposes of Indiana Code Title 13.

34.     Pursuant to authority under Indiana Code Section 13-19-3-1, the Indiana Environmental Rules Board is authorized to adopt rules to regulate solid and hazardous waste in Indiana, including rules necessary to implement RCRA (42 U.S.C. §§ 6901, *et seq.*).

35.     The Indiana Environmental Rules Board adopted rules to regulate solid waste processing facilities at 329 IAC Article 11.

**Enforcement of RCRA**

36.     Pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), the United States may commence a civil action in an appropriate United States District Court whenever any person is in violation of any requirement under Subtitle C of RCRA, including any requirement of a federally authorized state hazardous waste management program, such as the hazardous waste management programs for Louisiana, Indiana, Colorado, Georgia, and Pennsylvania, and any requirement of a federally authorized state used oil management program. In addition, Louisiana and Indiana each has authority to enforce its own hazardous waste management program under state law.

37.     Pursuant to Section 3008(a) and (g), 42 U.S.C. § 6928(a) and (g), the United States District Court may grant appropriate relief for violations of requirements under RCRA Subtitle C, including issuance of a temporary or permanent injunction and assessment of civil penalties.

38.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461, note; Pub. L. 101-410), as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties

Inflation Adjustment Improvements Act of 2015 (28 U.S.C. § 2461 note; Pub. L. 114-74, Section 701), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), the Court may assess civil penalties of up to $81,540 per day for each day of violation of Subtitle C of RCRA.

39.     Pursuant to Indiana Code Section 13-14-2-6 (4), IDEM may proceed in court, by appropriate action, to procure compliance with any standard or rule of the Environmental Rules Board and pursuant to Indiana Code Section 13-30-4-1(b) may commence a civil action to seek injunctive relief and recover a civil penalty for violations of environmental laws, rules or permits.

### OVERVIEW OF HCC'S PARTS CLEANING SOLVENT SERVICES

40.     HCC provides parts cleaning solvent services, containerized waste management services, and used oil collection services to a broad range of customers across the country.

41.     As part of its parts cleaning solvent services, HCC distributes solvent products to customers, collects used solvents from its customers, and manages the used solvents prior to resale or redistribution.

42.     HCC owns or operates numerous facilities at various locations throughout the United States, including approximately 89 facilities that HCC refers to as "branch" facilities and several other facilities that HCC refers to as "distribution hubs." HCC uses the branch and hub facilities as part of its product distribution network, as well as for consolidation or transfer of used solvent and used oil that HCC collects from its customers.

43.     As part of its parts cleaning services, HCC distributes solvent products, including products that it refers to as "142 solvent" and "106 solvent."

44.     In referring to products as 142 solvent or 106 solvent, the numbers "142" and "106" refer to the claimed flashpoints of the respective solvents, but HCC does not test the flashpoint of each container of solvent, and the actual flashpoint of different containers of each

of these solvents, particularly used solvents, varies. For example, samples of product 142 solvent containers delivered to one of HCC's customers exhibited flashpoints of 121°F, 136°F, and 126°F, prior to any use of such solvents.

45.     When HCC customers use 142 solvent or 106 solvent to clean parts, the cleaning process removes dirt or other material from the parts being cleaned. Over time, this removed material accumulates in the cleaning solvent until the used solvent is no longer suitable for parts cleaning. HCC periodically picks up used 142 or 106 solvent from its customers and replaces such used solvent with product 142 or 106 solvent for its customers' continuing parts cleaning needs. The used solvent is a "spent material" within the meaning of 40 C.F.R. § 261.1(c)(1) (2005, 2008, and 2016), LAC 33:V.109 (2014), and 6 CCR 1007-3 § 261.1(d)(1) (2012).

46.     After collecting drums or other containers of used 142 solvent from its parts cleaning customers, HCC transports it to an HCC facility located at 3970 West 10th Street, Indianapolis, Indiana (the "10th Street Facility"), where the used solvent is "reclaimed" by distillation within the meaning of 40 C.F.R. § 261.1(c)(4) (2008). In many instances, used 142 solvent may first be transported by HCC to other branch or hub facilities, and combined into bulk containers, such as railcars, before the used solvents are ultimately delivered to the 10th Street Facility.

47.     After reclaiming used 142 solvent via distillation, HCC regularly adds to the reclaimed 142 solvent virgin solvent that HCC buys from a third party. Reclaimed 142 solvent is repackaged in 16, 30, and 55-gallon drums prior to delivery of the reclaimed solvent to HCC's parts cleaning customers.

48.     After collecting drums or other containers of used 106 solvent from its parts cleaning customers, HCC transports it to various other HCC facilities including a facility located

at 3450 Hollywood Avenue, Shreveport, Louisiana ("Shreveport Hub"), the 10th Street Facility, and a facility in Hammond, Indiana where HCC leases one or more tanks from Wolf Lake Terminals, Inc.

49.     As described below in this complaint, HCC removes water and solids from used 106 solvent. After removing water and solids from the used 106 solvent, HCC sells the solvent to various customers, including manufacturers of roofing materials. HCC disposes of water and solids removed from the used 106 solvent as hazardous waste.

## SHREVEPORT HUB ALLEGATIONS

50.     Since at least March of 2006, HCC has operated its Shreveport Hub on approximately 20 acres of property that HCC leases from Preston Place Apartments, LLC.

51.     The Shreveport Hub is generally bounded by a residential area to the north, open land to the west, Hollywood Avenue to the south and railroad tracks to the east.

52.     Pursuant to Section 3010 of RCRA, HCC submitted a notification of hazardous waste activity to LDEQ on or about September 19, 2007. In that notification, HCC identified the Shreveport Hub as a RCRA large quantity generator of hazardous waste.

53.     The Shreveport Hub was assigned EPA ID no. LAD985174234.

### Management of used 106 solvent at the Shreveport Hub

54.     Since at least November of 2015, HCC has regularly transported to the Shreveport Hub drums or other containers of used 106 solvent that HCC picked up from certain of its parts cleaning customers located within a geographic area served by the Shreveport Hub. Such drums or containers typically range in size from 30 to 55 gallons.

55.     The used 106 solvent that HCC picks up from customers and delivers to the Shreveport Hub is "spent material" within the meaning LAC 33:V.109 (2014).

Complaint

Page 12

U.S, IN, & LDEQ v. Heritage-Crystal Clean, LLC,
Civil Action No. 1:22-cv-00303 (N.D. Il.)

56.     Used 106 solvent that HCC picks up from its parts cleaning customers regularly contains varying amounts of water and other substances that were introduced into the 106 solvent as a result of the customers' use of the 106 solvent.

57.     HCC regularly re-sells the commercially valuable fraction of the used 106 solvent received at the Shreveport Hub for use in various applications, including in roofing material applications.

58.     On a regular basis, the used 106 solvent received at the Shreveport Hub is not suitable for use in various resale applications, including roofing material applications, unless HCC alters the composition of the used 106 solvent by, among other things, reducing the aqueous content of the used 106 solvent until it meets applicable product specifications.

59.     As part of its management of used 106 solvent at the Shreveport Hub, HCC has, since at least November of 2015, regularly mixed used 106 solvent from multiple HCC customers by combining the contents of drums or other containers of used 106 solvent in one or more tanks, including, at relevant times, a tank referred to by HCC as Tank 33 that has a capacity of more than 20,000 gallons.

60.     After combining used 106 solvent from different HCC customers, as described in Paragraph 59, above, HCC regularly subjects the resulting used 106 solvent mixtures to iterative gravity separation, in which used 106 solvent in various tanks or containers is allowed to settle for varying periods of time to form different layers, with denser, predominantly aqueous material and solids settling to the bottom of a tank or container, and less dense, predominantly solvent material collecting at the top of the tank or container.

61.     After used 106 solvent settles into different layers as described in the previous paragraph, HCC separates layers that consist predominantly of solvent materials into different

Complaint                                    Page 13          U.S, IN, & LDEQ v. Heritage-Crystal Clean, LLC,
                                                              Civil Action No. 1:22-cv-00303 (N.D. Il.)

tanks from the tanks or containers that it uses to hold layers that consist predominantly of aqueous and solid materials.

62.    After separating aqueous and solvent fractions of used 106 solvent into different containers as described in the preceding paragraph, HCC may subject the separated fractions to one or more additional sequences of gravity separation in order to remove more aqueous material from separated solvent fractions and to recover additional solvent material from the separated aqueous fraction.

63.    At the Shreveport Hub, HCC has used a series of tanks, including, at various times, tanks referred to by HCC as Tank 30, Tank 33, Tank 43, and Tank 44, as well as numerous smaller containers, including "totes" that each have a capacity of approximately 275 gallons, for separating a commercially valuable solvent fraction of the used 106 solvent from an aqueous and solid material fraction that is disposed of as hazardous waste. Although HCC retains used 106 solvent in these tanks or containers for varying periods of time, as of October 2015, at least one of the tanks, Tank 30, had retained used 106 solvent for a period of 5-6 months.

64.    HCC tests the separated solvent materials to determine whether they meet re-sale product specifications, including specifications limiting the acceptable water content of the solvents it sells for use in roofing material applications. HCC continues to gravity separate used 106 solvent until the separated solvent fraction meets applicable product specifications.

65.    As a result of the management of the used 106 solvent described in Paragraphs 60 - 64, above, HCC removes a substantial volume of water and solids from the used 106 solvent received at the Shreveport Hub. HCC regularly sends totes containing aqueous waste and solids separated from the used 106 solvent at the Shreveport Hub to offsite locations for disposal as hazardous waste.

66.     After removing predominantly aqueous material and solids from used 106 solvent as described in Paragraphs 60 - 65, above, HCC sells the remaining solvent material for various applications, including for use in roofing material applications.

67.     Because the practices described in Paragraphs 60 - 65, above, result in recovery of a usable product from used 106 solvent at the Shreveport Hub, such used 106 solvent is "reclaimed" and a "reclaimed material" within the meaning of LAC 33:V.109 (2014).

68.     Spent materials that are reclaimed, such as used 106 solvent at the Shreveport Hub, are "recycled" and "recyclable material" within the meaning of LAC 33:V.109 (2014).

69.     Because HCC's management of used 106 solvent received at the Shreveport Hub constitutes reclamation and recycling of spent material, the drums or other containers of used 106 solvent that HCC receives at the Shreveport Hub contain "discarded material" and "solid waste" within the meaning of LAC 33:V.109 (2014).

70.     Pursuant to LAC 33:V.109.*HazardousWaste*.2.a (2014), a solid waste is subject to regulation as a hazardous waste when it exhibits any of the characteristics identified in LAC 33:V.4903.B-E (2014). Pursuant to LAC 33:V.109.*HazardousWaste*.3.c (2014), a solid waste mixture is subject to regulation as a hazardous waste when it exhibits any of the characteristics identified in LAC 33:V.4903.B-E (2014).

71.     EPA and LDEQ conducted Compliance Evaluation Inspections of the Shreveport Hub on November 16-20, 2015 ("November 2015 Inspection") and June 7-9, 2016 ("June 2016 Inspection").

72.     During the November 2015 Inspection, EPA collected representative samples of the used 106 solvent present in numerous tanks and containers at the Shreveport Hub, including

one or more separate representative samples from each of the following: Tank 30, Tank 33, Tank 43, Tank 44, and totes that HCC refers to as Tote 9, Tote 10, Tote 16, Tote 29, and Tote 30.

73.     A representative sample collected from each tank referred to in Paragraph 72, above, during the November 2015 Inspection was a liquid with a flash point below 140 degrees Fahrenheit, determined in accordance with LAC 33:V.4903.B.1 (2014). The used 106 solvent in each tank referred to in Paragraph 72, above, exhibited the characteristic of ignitability within the meaning of LAC 33:V.4903.B.1 (2014).

74.     At the time of the November 2015 Inspection, the used 106 solvent in each of the tanks referred to in Paragraph 72, above, was a hazardous waste within the meaning of LAC 33:V.4903 (2014).

75.     A representative sample of used 106 solvent collected from each tote referred to in Paragraph 72, above, during the November 2015 Inspection was a liquid with a flash point below 140 degrees Fahrenheit, determined in accordance with LAC 33:V.4903.B.1 (2014). The used 106 solvent mixture in each such tote exhibited the characteristic of ignitability within the meaning of LAC 33:V.4903.B (2014).

76.     Separate representative samples of the used 106 solvent collected from Tote 9, Tote 16, Tote 29, and Tote 30, respectively, during the November 2015 Inspection were evaluated in accordance with LAC 33:V.4903.E.1 (2014), using SW-846 Test Method 1311. An extract from each such sample, obtained using SW-846 Test Method 1311, contained lead in concentrations greater than or equal to 5.0 mg/L.

77.     An extract obtained using SW-846 Test Method 1311 from the representative sample of used 106 solvent present in Tote 30 contained 1,2-dichloroethane in a concentration greater than or equal to 0.5 mg/L.

78.     At the time of the November 2015 Inspection, Totes 9, 16, 29, and 30 above, each contained used 106 solvent that exhibited the characteristic of toxicity within the meaning of LAC 33:V.4903.E (2014).

79.     At the time of the November 2015 inspection, the used 106 solvent in each of the totes referred to in Paragraph 72, above, was hazardous waste within the meaning of LAC 33:V.4903 (2014).

<u>Management of used 142 solvent at the Shreveport Hub</u>

80.     Since at least November of 2015, HCC has regularly transported to the Shreveport Hub drums or other containers of used 142 solvent that HCC picked up from certain of its parts cleaning customers located within a geographic area served by the Shreveport Hub. Such drums or other containers typically range in size from 30 to 55 gallons.

81.     The used 142 solvent that HCC picks up from customers and delivers to the Shreveport Hub is "spent material" within the meaning LAC 33:V.109 (2014).

82.     Used 142 solvent that HCC picks up from its parts cleaning customers regularly contains varying amounts of water and other substances that were introduced into the 142 solvent as a result of the customers' use of the 142 solvent.

83.     Since at least November of 2015, HCC has regularly mixed used 142 solvent from multiple HCC customers by combining the contents of drums and other containers of used 142 solvent received from different HCC customers in one or more tanks at the Shreveport Hub, including, at relevant times, a tank referred to by HCC as Tank 18, which has a capacity of at least 29,000 gallons.

84.     At various times since at least November of 2015, HCC regularly moved 142 solvent from Tank 18 into one or more other tanks at the Shreveport Hub, including, at relevant times, a tank referred to by HCC as Tank 40, which has a capacity of more than 200,000 gallons.

85.     HCC pumps used 142 solvent from one or more tanks at the Shreveport Hub, including, at relevant times, Tank 40, into rail cars that are used to transport the used 142 solvent to HCC's 10th Street Facility, where the used 142 solvent is fed into a vapor distillation column to recover usable solvent product.

86.     The used 142 solvent that HCC receives at the Shreveport Hub is a "solid waste" within the meaning of LAC 33:V.109 (2014).

87.     During the November 2015 Inspection, EPA collected representative samples from numerous tanks and containers at the Shreveport Hub, including one or more separate representative samples from Tank 40.

88.     A representative sample of the used 142 solvent collected from Tank 40 during the November 2015 Inspection, was a liquid with a flash point below 140 degrees Fahrenheit, determined in accordance with LAC 33:V.4903.B.1 (2014). Such used 142 solvent liquids in Tank 40 exhibited the characteristic of ignitability within the meaning of LAC 33:V.4903.B.

89.     A representative sample of the used 142 solvent collected from Tank 40 during the November 2015 Inspection was evaluated in accordance with LAC 33:V.4903.E.1 (2014), using SW-846 Test Method 1311. An extract from this sample obtained using SW-846 Test Method 1311, contained trichloroethylene at a concentration greater than or equal to 0.5 mg/L.

90.     An extract from the sample referred to in Paragraph 89, above, obtained using SW-846 Test Method 1311, contained tetrachloroethylene at a concentration greater than or equal to 0.7 mg/L.

91.     An extract from the sample referred to in Paragraph 89, above, obtained using SW-846 Test Method 1311, contained methyl ethyl ketone (2-Butanone) at a concentration greater than or equal to 200.0 mg/L.

92.     At the time of the November 2015 Inspection, the used 142 solvent in Tank 40 exhibited the characteristic of toxicity within the meaning of LAC 33:V.4903.E (2014).

93.     At the time of the November 2015 inspection, the used 142 solvent in Tank 40 was hazardous waste within the meaning of LAC 33:V.4903 (2014).

94.     During the June 2016 Inspection, EPA collected a representative sample of the contents of one or more drums or other containers of used 142 solvent at the Shreveport Hub.

95.     An extract from at least one of the samples referred to in Paragraph 94, above, obtained using SW-846 Test Method 1311, contained trichloroethylene at a concentration greater than or equal to 0.5 mg/L.

96.     At the time of the June 2016 Inspection, the used 142 solvent in at least one drum or other container at the Shreveport Hub exhibited the characteristic of toxicity within the meaning of LAC 33:V.4903.E (2014).

97.     At the time of the June 2016 inspection, the used 142 solvent in the drum or container referred to in Paragraph 96, above, was hazardous waste within the meaning of LAC 33:V.4903 (2014).

98.     The Shreveport Hub is a "facility" as that term is defined in LAC 33:V.109 (2014).

### SHREVEPORT HUB CLAIMS FOR RELIEF

#### First Claim for Relief
#### (Failure to Make Required Hazardous Waste Determinations)

99.     The allegations in Paragraphs 1–9, 14–27, 36–38, and 40–98, above, are realleged and incorporated herein by reference.

100.    Pursuant to LAC 33:V.1103 (2014), HCC is required to determine whether solid waste that it generates at the Shreveport Hub is hazardous waste.

101.    Each time HCC combines used 106 solvent from different customers or sources as described in Paragraph 59, HCC creates a new mixture of used 106 solvent. The composition of such new solvent mixtures may differ from the composition of the individual drums or other containers of used 106 solvent originally received by HCC at the Shreveport Hub. Such new solvent mixtures are new solid wastes, within the meaning of LAC 33:V.109 (2014), generated by HCC at the Shreveport Hub.

102.    Each time HCC combines used 142 solvent from different customers or sources as described in Paragraph 83, HCC creates a new mixture of used 142 solvent. The composition of such new solvent mixtures may differ from the composition of the individual drums or other containers of used 142 solvent originally received by HCC at the Shreveport Hub. Such new solvent mixtures are new solid wastes, within the meaning of LAC 33:V.109 (2014), generated by HCC at the Shreveport Hub.

103.    At the time of the November 2015 Inspection, HCC had not made a determination in accordance with the requirements of LAC 33:V.1103 (2014) as to whether the solid wastes generated as described in Paragraphs 101 and 102 were hazardous wastes.

104.    HCC had not tested the solid waste mixtures that were present in Tanks 18 and 33 at the Shreveport Hub at the time of the November 2015 Inspection, in accordance with methods set forth in LAC 33:V.4903 (2014), or an equivalent method approved by the Secretary of LDEQ under LAC 33:V.1103 (2014).

105.    As of the November 2015 Inspection, HCC had not performed sufficient testing of different used solvent mixtures referred to in Paragraphs 101 and 102 to determine that, regardless of any variability of the composition of drums or other containers of used solvent

received from individual HCC customers, the used solvent mixtures generated by HCC would not exhibit the hazardous waste characteristics of ignitability or toxicity.

106.    As of the time of the June 2016 Inspection, HCC did not possess sufficient information about the actual materials and processes used by each HCC customer that generated used solvents received at the Shreveport Hub to know whether the used solvent mixtures generated by consolidating solvents from different customers would exhibit the characteristics of ignitability or toxicity.

107.    Each instance in which HCC generated new solid wastes at the Shreveport Hub as described in Paragraphs 101 and 102, above, without making an accurate hazardous waste determination constitutes a violation of LAC 33:V.1103.B (2014).

108.    HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA and La. R.S. 30:2025 based on the acts or omissions alleged in this claim for relief.

109.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA. Pursuant to La. R.S. 30:2025(E)(1)(a), HCC is currently subject to the assessment of civil penalties of up to $32,500 per day for each of the violations set forth above in this claim for relief.

**<u>Second Claim for Relief</u>**
**(Storage of Hazardous Waste Without a Permit or Interim Status)**

110.    The allegations in Paragraphs 1–9, 14–27, 36–38, and 40–98, above, are realleged and incorporated herein by reference.

111.    Section 3005 of RCRA, 42 U.S.C. § 6925, and LAC 33:V.303.B (2014) prohibit the treatment, storage, or disposal of hazardous waste by any person without a RCRA permit or interim status.

112.    At no time has HCC had a permit issued by LDEQ pursuant to Section 3005 of RCRA, 42 U.S.C. § 6925, La. R.S. 30:2183 or LAC 33:V.305 (2014) authorizing HCC to treat, store, or dispose of hazardous waste at the Shreveport Hub.

113.    At no time has HCC applied for a permit to treat, store or dispose of hazardous waste at the Shreveport Hub, in accordance with Section 3005 of RCRA, 42 U.S.C. § 6925, La. R.S. 30:2183, or LAC 33:V.501 (2014).

114.    At no time has HCC's Shreveport Hub qualified as an "interim status" facility under Section 3005(e) of RCRA, 42 U.S.C. § 6925(e), La. R.S. 30:2183, or LAC 33:V.4301.B (1995).

115.    At various times since at least 2015, HCC has engaged in "storage," as defined in LAC 33:V.109 (2014), at the Shreveport Hub of one or more drums or other containers of used 106 solvent generated by HCC customers at locations other than the Shreveport Hub. Used 106 solvent in one or more drums or containers stored by HCC at the Shreveport Hub exhibited hazardous waste characteristics and constituted hazardous waste.

116.    At various times since at least 2015, HCC has engaged in "storage," as defined in LAC 33:V.109 (2014), of totes that contained the aqueous and solids separated from the used 106 solvent. Such separated aqueous and solid materials exhibited hazardous waste characteristics and constituted hazardous waste.

117.    At various times since at least 2015, HCC has engaged in "storage," as defined in LAC 33:V.109 (2014), at the Shreveport Hub of one or more drums or other containers of used

142 solvent generated by HCC customers at locations other than the Shreveport Hub. Used 142 solvent in one or more of the drums or containers stored by HCC at the Shreveport Hub exhibited hazardous waste characteristics and constituted hazardous waste.

118.     At various times since at least 2015, HCC's activities at the Shreveport Hub have included "storage," as defined in LAC 33:V.109 (2014) of used 142 solvent in one or more tanks, including Tank 40. On one or more occasions, HCC stored used 142 solvent that exhibited hazardous waste characteristics in one or more tanks, including Tank 40.

119.     As a result of the acts or omissions described above in this claim for relief, HCC violated Section 3005 of RCRA, 42 U.S.C. § 6925, LAC 33:V.303.B, and LAC 33:V.305.A (2014).

120.     Each instance in which HCC stored hazardous waste at the Shreveport Hub without a permit or interim status constitutes a separate violation of Section 3005 of RCRA, 42 U.S.C. § 6925, La. R.S. 30:2183, LAC 33:V.303.B, and LAC 33:V.305.A (2014).

121.     HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA and La. R.S. 30:2025 based on the acts or omissions alleged in this claim for relief.

122.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA. Pursuant to La. R.S. 30:2025(E)(1)(a), HCC is currently subject to the assessment of civil penalties of up to $32,500 per day for each of the violations set forth above in this claim for relief.

**Third Claim for Relief**
**(Failing to Control Emissions from Hazardous Waste Tanks)**

123.    The allegations in Paragraphs 1–9, 14–27, 36–38, 40–98, and 118, above, are realleged and incorporated herein by reference.

124.    At various times since at least November of 2015, HCC has owned or operated "tanks" as defined in LAC 33:V.109 (2014) at the Shreveport Hub, including a tank referred to by HCC as Tank 40 at the Shreveport Hub ("Tank 40").

125.    At various times since at least November of 2015, Tank 40 was part of a "tank system" as defined in LAC 33:V.109 (2014).

126.    Since at least November of 2015, HCC has regularly stored used 142 solvent in Tank 40.

127.    On one or more occasions since at least November of 2015, used 142 solvent that HCC stored in Tank 40 was hazardous waste.

128.    At various times since at least November of 2015, Tank 40 was subject to LAC 33:V.Chapter 19 (2014).

129.    Pursuant to LAC 33:V.1747.A (2014), HCC is subject to the requirements of LAC 33:V.Chapter 17 (2014), as the owner or operator of a facility that has stored hazardous waste in Tank 40.

130.    Pursuant to LAC 33:V.1751.B (2014) owners or operators of tanks subject to LAC 33:V.Chapter 17 (2014) must control air pollutant emissions from such tanks in accordance with applicable provisions of LAC 33:V.1755 (2014), except as provided in LAC 33:V.1751.C (2014).

131.    Owners and operators of tanks that are subject to LAC 33:V.1755 (2014) may elect to control air pollutant emissions from such tanks either by implementing Tank Level 1

controls specified in LAC 33:V.1755.C (2014) if the hazardous wastes managed in such tanks meet all of the conditions specified in LAC 33:V.1755.B.1.a-c (2014) or by implementing Tank Level 2 controls specified in LAC 33:V.1755.D (2014).

132.    Owners and operators of tanks that are subject to LAC 33:V.1755 (2014) must implement Tank Level 2 controls specified in LAC 33:V.1755.D (2014) to control air emissions from any such tanks that are used to manage hazardous wastes that do not meet all of the conditions specified in LAC 33:V.1755.B.1.a.-c (2014).

133.    Since at least November of 2015, Tank 40 was equipped with a "fixed roof" as defined in LAC 33:V.1703 and 1749 (2014), with one or more openings that vent air pollutants to the atmosphere. Since at least November of 2015, Tank 40 had at least one fixed roof opening that was neither equipped with a "closure device" as defined in LAC 33:V.1703 and 1749 (2014) nor connected by a "closed vent system" to a "control device" meeting the requirements of LAC 33:V.1761.B and C (2014). Thus, Tank 40 did not satisfy Tank Level 1 control requirements, including the requirements specified in LAC 33:V.1755 (2014).

134.    Since at least November of 2015, Tank 40 was not vented through a closed vent system to a control device meeting the requirements of LAC 33:V.1761.B and C (2014). Thus, Tank 40 did not satisfy the Tank Level 2 control alternative specified in LAC 33:V.1755.D.3 and G (2014).

135.    Since at least November of 2015, Tank 40 was not equipped with an "internal floating roof" as defined in LAC 33:V.1703 and 1749 (2014). Thus, Tank 40 did not satisfy the Tank Level 2 control alternative specified in LAC 33:V.1755.D.1 and E (2014).

136.    Since at least November of 2015, Tank 40 was not equipped with an "external floating roof" as defined in LAC 33:V.1703 and 1749 (2014). Thus, Tank 40 did not satisfy

requirements of the Tank Level 2 control alternative specified in LAC 33:V.1755.D.2 and F (2014).

137.    Tank 40 is not a "pressure tank" within the meaning of LAC 33:V.1755.D.4 (2014). Thus, Tank 40 does not satisfy the requirements of the Tank Level 2 control alternative specified in LAC 33:V.1755.D.4 and H (2014).

138.    At no time since November of 2015 has Tank 40 been located in an "enclosure" that is vented through a "closed-vent system" as those terms are defined in LAC 33:V.1703 and 1749 (2014), to an enclosed combustion device. Thus, Tank 40 does not satisfy requirements of the Tank Level 2 control alternative specified in LAC 33:V.1755.D.4 and I (2014).

139.    At no time since November of 2015 has HCC controlled the emission of air pollutants from Tank 40 in accordance with the requirements of LAC 33:V.1751.B and 1755 (2014).

140.    Each instance in which HCC stored hazardous waste in Tank 40 without controlling the emission of air pollutants in accordance with the requirements of LAC 33:V.1751.B and 1755 (2014) constitutes a separate violation of LAC 33:V.1751.B and 1755 (2014).

141.    HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA and La. R.S. 30:2025 based on the acts or omissions alleged in this claim for relief.

142.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA. Pursuant to La. R.S. 30:2025(E)(1)(a),

HCC is currently subject to the assessment of civil penalties of up to $32,500 per day for each of the violations set forth above in this claim for relief.

### Fourth Claim for Relief
**(Failure to Maintain Records Supporting Determination
Whether Equipment is Subject to LAC 33:V.1719-1735)**

143.     The allegations in Paragraphs 1–9, 14–27, 36–38, 40–98, 115–118 above, are realleged and incorporated herein by reference.

144.     Since at least November of 2015, HCC has regularly engaged in "treatment" or "storage" of hazardous waste within the meaning of LAC 33:V.109 (2014), or both, in various tanks, totes or other containers at the Shreveport Hub, including each of the tanks, totes or containers referred to in Paragraphs 72, 93, 97, 115, and 117.

145.     Since at least November of 2015, HCC has regularly managed used organic solvents, including used 106 solvent and used 142 solvent that exhibited hazardous waste characteristics, in various tanks, totes or other containers at the Shreveport Hub, including, at relevant times, the tanks, totes and other containers referred to in Paragraph 144.

146.     As part of its management of the used solvents at the Shreveport Hub, HCC regularly adds used organic solvents to, or removes used organic solvents from, each of the tanks, totes and other containers referred to in Paragraph 145, above. In the course of moving organic solvent material into or out of such tanks, totes and other containers, the organic solvent materials come into contact with, or are contained, in various items of equipment, including, without limitation, various pumps, valves, and flanges.

147.     Pursuant to LAC 33:V.1743.K.3 (2014), HCC is required to record and maintain specified information, including an up-to-date-analysis and supporting information and data used to determine whether the equipment referred to in Paragraph 146 is subject to the requirements of LAC 33:V.1719-1735 (2014).

148.     Under LAC 33:V.1743.K.3 (2014) and 1741.D (2014), HCC is required to determine the organic concentration of hazardous waste that comes into contact with the equipment referred to in Paragraph 146, in accordance with methods set forth in LAC 33:V.1741.D.1 and 2 (2014), and to maintain such information in a log that is kept as part of the operating record for the Shreveport Hub.

149.     HCC did not maintain records required pursuant to LAC 33:V.1743.K.3 (2014).

150.     As a result of the acts or omissions referred to in Paragraph 149, HCC violated LAC 33:V.1743 (2014).

151.     HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA and La. R.S. 30:2025 based on the acts or omissions alleged in this claim for relief.

152.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA. Pursuant to La. R.S. 30:2025(E)(1)(a), HCC is currently subject to the assessment of civil penalties of up to $32,500 per day for each of the violations set forth above in this claim for relief.

**Fifth Claim for Relief**
**(Management of Used Oil)**

153.     The allegations in Paragraphs 1–9, 14–27, 36–38, 40, 42, and 50–53, above, are realleged and incorporated herein by reference.

154.     As part of its business, HCC regularly transports to the Shreveport Hub "used oil," as defined in LAC 33:V.4001 (2014), that HCC collects from various industrial or commercial sources.

155.    HCC does not process or re-refine used oil at the Shreveport Hub, but HCC transports used oil from the Shreveport Hub to other locations, including HCC's 10th Street Facility, where the used oil is processed or re-refined prior to resale.

156.    Since at least November of 2015, HCC has regularly stored used oil at the Shreveport Hub in one or more aboveground tanks, including tanks referred to by HCC as Tank 1, Tank 7, and Tank 60.

157.    Each of the tanks referred to in Paragraph 156, above, was in operation on or before June 11, 1996, the date Louisiana's used oil program was authorized.

158.    Each of the tanks referred to in Paragraph 156, above, is an "existing tank" within the meaning of LAC 33:V.4001 (2014).

159.    LAC 33:V.4035 (2014) establishes various standards governing management of used oil, including standards that are applicable to each "used oil transfer facility" as defined in LAC 33:V.4001 (2014) where shipments of used oil are held for more than 24 hours during the normal course of transportation and not longer than 35 days.

160.    Pursuant to LAC 33:V.4035.A (2014), transfer facilities that store used oil for more than 35 days are subject to regulation under LAC 33:V.Chapter 40, Subpart E (2014), including used oil management requirements set forth in LAC 33:V.4049 (2014).

161.    On one or more occasions since at least November of 2015, HCC has stored used oil for more than 35 days at the Shreveport Hub.

162.    Under both LAC 33:V.4035.G.1 and 4049.F.1 (2014), containers and aboveground tanks that are used to store used oil must be labelled or marked clearly with the words "Used Oil."

163.    On one or more occasions since at least November of 2015, at least Tank 7 at the Shreveport Hub was not clearly marked with the words "Used Oil."

164.    As a result of the acts or omissions referred to in Paragraph 163, above, HCC violated applicable requirements under LAC 33:V.4035.G.1 (2014) or LAC 33:V.4049.F.1 (2014).

165.    Under both LAC 33:V.4035.E and LAC 33:V.4049.D (2014), aboveground tanks used to store used oil must be equipped with a secondary containment system with a floor and dikes, berms, or retaining walls that are sufficiently impervious to prevent any used oil which is released into the containment system from migrating out of the containment system to the soil, groundwater or surface water.

166.    Although the aboveground tanks referred to in Paragraph 156, above, are equipped with a secondary containment system, the floor of that secondary containment system included one or more expansion joints that at various times since at least November of 2015 were maintained in a condition that has allowed a direct hydraulic connection between the secondary containment system and underlying soil and groundwater. As a result, the floor of the secondary containment system was not sufficiently impervious to prevent any used oil released into the containment system from migrating to soil or groundwater beneath the secondary containment system.

167.    As a result of the acts or omissions referred to in Paragraph 166, above, HCC violated applicable requirements under LAC 33:V.4035.E (2014) or LAC 33:V.4049.D (2014).

168.    HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA and La. R.S. 30:2025 based on the acts or omissions alleged in this claim for relief.

169.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and

87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540

for each day of each violation of Subtitle C of RCRA. Pursuant to La. R.S. 30:2025(E)(1)(a),

HCC is currently subject to the assessment of civil penalties of up to $32,500 per day for each of

the violations set forth above in this claim for relief.

## 10TH STREET FACILITY ALLEGATIONS

170.    Since at least 1999, HCC has conducted various business operations, including

storage and management of used solvent at the 10th Street Facility.

171.    HCC has owned and operated the 10th Street Facility since approximately June of

2009. Prior to purchasing the property in 2009, HCC leased the 10th Street Facility from a third

party.

172.    The 10th Street Facility is generally bounded by West 10th Street on the south,

Holt Road on the east, railroad tracks on the north, and other commercial or industrial properties.

There are extensive residential areas to the east and southeast of the 10th Street Facility, with

some residential properties within 500 feet of the 10th Street Facility.

173.    As part of its operations at the 10th Street Facility, HCC has received, and

continues to receive, shipments of used solvents, including both used 142 solvent and used 106

solvent.

174.    At the 10th Street Facility, HCC has owned or operated, and continues to own or

operate, numerous tanks, some of which have been used, and continue to be used, to store used

solvents, including used 142 solvent and used 106 solvent.

175.    At the 10th Street Facility, HCC has owned or operated, and continues to own or

operate, a vapor distillation column used to process used 142 solvent to recover usable solvent

Complaint

Page 31    U.S, IN, & LDEQ v. Heritage-Crystal Clean, LLC,
Civil Action No. 1:22-cv-00303 (N.D. Il.)

material. Through operation of the vapor distillation column and various other activities at the 10th Street Facility, HCC generates waste materials.

176. The 10th Street Facility is a "facility" as that term is defined in 40 C.F.R. § 260.10 (2008).

177. The 10th Street Facility was assigned EPA RCRA ID No. INR000006536.

178. EPA and IDEM conducted Compliance Evaluation Inspections of the 10th Street Facility on June 26-29, 2017 ("June 2017 Inspection") and October 9-10, 2019 ("October 2019 Inspection"). As part of these inspections, EPA collected numerous samples, including samples of the contents of various tanks at the 10th Street Facility.

<u>Management of used 142 solvent at the 10th Street Facility</u>

179. As part of its parts cleaning enterprise, HCC regularly picks up drums or other containers of used 142 solvent from numerous different HCC customers at various locations throughout the United States, and transports such drums or containers to various facilities owned or operated by HCC. Since at least June of 2017, HCC has regularly transported drums or other containers of such used 142 solvent to its 10th Street Facility.

180. Since at least June of 2017, the 10th Street Facility has regularly received bulk shipments of used 142 solvent mixtures from other HCC facilities, including the Shreveport Hub and a facility referred to as the Atlanta Hub, where HCC regularly combines the contents of drums and other containers of used 142 solvent from numerous different HCC customers into larger containers, such as railcars, that are used for bulk shipments of used 142 solvent mixtures.

181. As part of its management of used 142 solvent at the 10th Street Facility, HCC has, since at least June of 2017, regularly mixed containers of used 142 solvent from multiple different HCC customers. HCC regularly combined the contents of numerous drums of used 142 solvent from multiple different HCC customers in one or more tanks at the 10th Street Facility,

including at relevant times, a tank referred to as "Tank 16," which has a capacity of over 18,000 gallons. In addition, HCC regularly received at the 10th Street Facility railcars that contained mixtures of used 142 solvent from multiple different HCC customers, and HCC regularly combined the contents of such railcars with waste present in one or more tanks, including at relevant times, a tank referred to by HCC as "Tank 17," which has a capacity of more than 10,000 gallons, and a tank referred to by HCC as "Tank 7," which has a capacity of more than 70,000 gallons.

182. After mixing drums of used 142 solvent from multiple different HCC customers in Tank 16 as described in Paragraph 181, HCC's regular practice is to pump portions of the used 142 solvent mixture into Tank 17 and Tank 7.

183. At the 10th Street Facility, HCC regularly feeds the used 142 solvent mixture from one or more tanks, including but not limited to Tank 7, into a vapor distillation column that uses heat to separate different constituents of the 142 solvent mixture so that HCC is able to recover usable product that meets product specifications that HCC has established for the 142 solvent it distributes. Solvent material that does not meet HCC product specifications when it is recovered from the vapor distillation column is returned to a storage tank so the off-specification material can be re-introduced into the vapor distillation column until the recovered material meets HCC's specifications for 142 solvent. Since at least the June 2017 Inspection, HCC's practice has been to return such off-specification material to Tank 7 at the 10th Street Facility, where the off-specification material is combined with used 142 solvent prior to re-introduction into the vapor distillation column.

184. HCC's product specifications for 142 solvent include, without limitation, a specification limiting the tetrachloroethylene content of 142 solvent to not more than 0.4 parts

per million. On numerous occasions, solvent material that HCC recovered from the vapor distillation column at the 10th Street Facility did not meet HCC's specifications regarding the tetrachloroethylene content of recovered solvent material. On several occasions between January of 2016 and June of 2017, off-specification solvent recovered from such vapor distillation column had a tetrachloroethylene content that exceeded 0.7 mg/L.

185.     As described in Paragraph 183, on occasions when solvent recovered from the vapor distillation column at the 10th Street Facility exceeded HCC's product specification for tetrachloroethylene, HCC's practice has been to combine material with excess tetrachloroethylene with other used 142 solvent, for subsequent reprocessing in the distillation column.

186.     After HCC recovers solvent material from the vapor distillation column that meets its specifications, HCC distributes the reclaimed 142 solvent to various HCC branches for sale to HCC parts cleaning customers.

187.     Because HCC manages the used 142 solvent at the 10th Street Facility to recover a usable product, such used 142 solvent materials are "reclaimed" and "recycled" within the meaning of 40 C.F.R. § 261.1(c)(4) and (7) (2008). The distillation of used 142 solvent at the 10th Street Facility also constitutes "reclamation" within 329 IAC 3.1-4-21.1 (2010), which is part of the federally authorized hazardous waste management program for Indiana.

188.     The used 142 solvent that HCC reclaims at the 10th Street Facility is "spent material" within the meaning of 40 C.F.R. § 261.1(c)(1) (2008) and "discarded material" within the meaning of 40 C.F.R. § 261.2(a)(2) (2008).

189.     The used 142 solvent that HCC receives at the 10th Street Facility is a "solid waste" within the meaning of 40 C.F.R. § 261.2(a)(1) (2008).

190.    Pursuant to 40 C.F.R. § 261.3(a)(2)(i) (2008), a solid waste is subject to regulation as a hazardous waste when it exhibits any of the characteristics identified in 40 C.F.R. §§ 260.21-24 (2008). Pursuant to 40 C.F.R. § 261.3(b)(3) (2008), a solid waste mixture is subject to regulation as a hazardous waste when it exhibits any of the characteristics identified in 40 C.F.R. §§ 261.21-24 (2008).

191.    During the June 2017 Inspection of the 10th Street Facility, EPA collected numerous samples of used 142 solvent from containers, including samples from one or more drums, and samples from one or more tanks, including the tanks that HCC refers to as Tanks 7 and 17.

192.    At the time of the June 2017 Inspection, HCC stored drums or other containers of used 142 solvent at the 10th Street Facility.

193.    During the June 2017 Inspection of the 10th Street Facility, EPA collected a representative sample of the contents of one or more drums or other containers of used 142 solvent. The representative sample from at least one such drum or other container was a liquid with a flash point below 140 degrees Fahrenheit, determined in accordance with 40 C.F.R. § 261.21 (2008).

194.    On at least one occasion since June of 2017, a drum or other container of used 142 solvent that HCC received at the 10th Street Facility exhibited the characteristic of "ignitability" within the meaning of 40 C.F.R. 261.21(a)(1) (2008), and was a "hazardous waste" within the meaning of 40 C.F.R. § 261.20(a) (2008).

195.    During the June 2017 Inspection of the 10th Street Facility, EPA collected a representative sample of the used 142 solvent in Tank 7. The sample was evaluated in accordance with 40 C.F.R. § 261.24(a) (2008), using SW-846 Test Method 1311. An extract

from such sample obtained using SW-846 Test Method 1311 contained tetrachloroethylene in a concentration greater than or equal to 0.7 mg/L.

196.    At the time of the June 2017 Inspection, the contents of Tank 7 exhibited the characteristic of toxicity within the meaning of 40 C.F.R. § 261.24(a) (2008).

197.    At the time of the June 2017 Inspection, the contents of Tank 7 were hazardous waste within the meaning of 40 C.F.R. § 261.20(a) (2008).

198.    During the June 2017 Inspection of the 10th Street Facility, EPA collected a representative sample of the used 142 solvent in Tank 17. The sample was evaluated in accordance with 40 C.F.R. § 261.24(a) (2008), using SW-846 Test Method 1311. An extract from such sample obtained using SW-846 Test Method 1311 contained tetrachloroethylene in a concentration greater than or equal to 0.7 mg/L.

199.    At the time of the June 2017 Inspection of the 10th Street Facility, the contents of Tank 17 exhibited the characteristic of toxicity within the meaning of 40 C.F.R. § 261.24(a) (2008).

200.    At the time of the June 2017 Inspection of the 10th Street Facility, the contents of Tank 17 were hazardous waste within the meaning of 40 C.F.R. § 261.20(a) (2008).

201.    During the October 2019 Inspection of the 10th Street Facility, EPA collected a representative sample of the used 142 solvent in Tank 16. The sample was evaluated in accordance with 40 C.F.R. § 261.24(a) (2008), using SW-846 Test Method 1311. An extract from the sample obtained using SW-846 Test Method 1311 contained tetrachloroethylene in a concentration greater than or equal to 0.7 mg/L.

202.    At the time of the October 2019 Inspection of the 10th Street Facility, the contents of Tank 16 exhibited the characteristic of toxicity within the meaning of 40 C.F.R. § 261.24(a) (2008).

203.    At the time of the October 2019 Inspection of the 10th Street Facility, the contents of Tank 16 were hazardous waste within the meaning of 40 C.F.R. § 261.20(a) (2008).

### Management of used 106 solvent at 10th Street Facility

204.    From at least June of 2017 until at least December of 2019, HCC has regularly transported to its facility located at 1560 West Raymond Street, Indianapolis, Indiana 46221 ("Raymond Street Facility") drums and other containers of used 106 solvent that HCC picked up from numerous different HCC parts cleaning customers within a geographic area served by HCC's Raymond Street Facility.

205.    Since at least June of 2017, HCC has regularly transported drums and other containers of used 106 solvent from various HCC facilities, including, without limitation, its Raymond Street Facility and its Atlanta Hub, to the 10th Street Facility.

206.    As part of its management of used 106 solvent at the 10th Street Facility, HCC has, since at least June of 2017, regularly mixed used 106 solvent from multiple HCC customers by combining the contents of numerous drums and other containers of used 106 solvent in one or more tanks at the 10th Street Facility, including, at relevant times, a tank referred to by HCC as Tank 3, that has a capacity of more than 18,000 gallons.

207.    HCC regularly re-sells the commercially valuable fraction of the used 106 solvent received at the 10th Street Facility for use in various applications, including in roofing material applications.

208.    On a regular basis, the used 106 solvent received at the 10th Street Facility is not suitable for use in various resale applications, including roofing material applications, unless

HCC alters the composition of such used 106 solvent by, among other things, reducing the aqueous content of the used 106 solvent until it meets applicable product specifications.

209.    HCC regularly subjects used 106 solvent that it receives at the 10th Street Facility to gravity separation to remove predominantly aqueous material and solids from the used 106 solvent. As described below in Paragraphs 210 - 218, this gravity separation and removal of predominantly aqueous material and solids may take place, in whole or in part, at locations other than the 10th Street Facility.

210.    After combining used 106 solvent from different HCC customers, as described in Paragraph 206, above, HCC's regular practice at the 10th Street Facility has been to pump used 106 solvent from tanks such as Tank 3 into railcars, which transport the used 106 solvent to a facility in Hammond, Indiana owned by Wolf Lake Terminals, Inc. (the "Wolf Lake Terminal").

211.    At the time of the June 2017 Inspection, HCC's regular practice was to ship most or all contents of Tank 3 to the Wolf Lake Terminal via railcars. At the time of the June 2017 Inspection, railcar shipments from the 10th Street Facility to the Wolf Lake Tank could contain up to 50 percent water.

212.    At the Wolf Lake Terminal, shipments of HCC's used 106 solvent material, including shipments from the 10th Street Facility and other locations, including a facility HCC formerly owned or operated in Fairless Hills, Pennsylvania, were pumped from railcars into one or more tanks that HCC leased from Wolf Lake Terminals, Inc. As part of this process, HCC regularly combined newly shipped used 106 solvent mixtures with used 106 solvent material that HCC had previously placed in tanks at the Wolf Lake Terminal.

213.    At the Wolf Lake Terminal, HCC stored used 106 solvent material in its leased tanks for periods of time that ranged from one to three weeks, in order to allow the material to

separate into different layers or phases, with denser, predominantly aqueous material and solids settling to the bottom of a tank or container, and less dense, predominantly solvent material collecting at the top of the tank or container.

214.    After HCC's used 106 solvent at the Wolf Lake Terminal is allowed to separate into different layers or phases, solvent material drawn from the top of HCC's tanks at the Wolf Lake Terminal is pumped into tanker trucks.

215.    During certain periods, tanker trucks containing solvent material referred to in Paragraph 214 returned to the 10th Street Facility, where the solvent material was sampled to determine whether the material met product specifications for "resale solvent." Solvent material that met HCC product specifications for resale solvent was then shipped by HCC to resale solvent customers. On one or more occasions solvent material that did not meet resale product specifications was returned to Tank 3 (or another used 106 solvent consolidation tank) at the 10th Street Facility and subsequently returned to the Wolf Lake Terminal for further gravity separation in HCC's leased tanks.

216.    During other time periods, HCC's standard operating procedures allowed the solvent material to be sampled at the Wolf Lake Terminal to determine whether the material met product specifications for resale of the solvent. During such time periods, if the sampled solvent material met HCC's product specifications for resale solvent, the resale solvent could be shipped directly from the Wolf Lake Terminal to resale solvent customers. During such time periods, sampled solvent material that did not meet HCC product specifications for resale solvent were further managed in HCC's tanks at the Wolf Lake Terminal, without first returning to the 10th Street Facility.

217.    Primarily aqueous material drawn from the bottom of HCC's tanks at the Wolf Lake Terminal was pumped into tanker trucks. During certain time periods, HCC shipped up to four tanker trucks of this bottom draw material to the 10th Street Facility per week.

218.    As a result of the management of used 106 solvent described in Paragraphs 210 - 217, HCC has removed a substantial volume of water and solids from the used 106 solvent that HCC received at the 10th Street Facility. On one or more occasions HCC has sent aqueous waste and solids separated from used 106 solvent at the 10th Street Facility to offsite locations for disposal as hazardous waste. After removing predominantly aqueous material and solids from the used 106 solvent, HCC sells the remaining solvent for various applications, including for use in roofing material applications.

219.    Used 106 solvent that HCC receives at the 10th Street Facility is "spent material" within the meaning of 40 C.F.R. § 261.1(c)(1) (2008).

220.    The used 106 solvent that HCC receives at the 10th Street Facility is "reclaimed" within the meaning of 40 C.F.R. § 261.1(c)(4) (2008), prior to any resale of such solvent for use in various applications, including roofing material applications, because the gravity separation described in Paragraphs 213 and 214, above, is necessary for HCC to recover a usable product from such used 106 solvent.

221.    Materials such as used 106 solvent that are reclaimed are "recycled" within the meaning of 40 C.F.R. § 261.1(c)(7) (2008).

222.    The used 106 solvent received at the 10th Street Facility that is "recycled" by being "reclaimed" constitutes "discarded material" within the meaning of 40 C.F.R. § 261.2(a)(2) (2008).

223. The used 106 solvent received at the 10th Street Facility constitutes "solid waste" within the meaning of 40 C.F.R. § 261.2(a)(1) (2008).

224. Pursuant to 40 C.F.R. § 261.20 (2008), a solid waste is subject to regulation as a hazardous waste when it exhibits any of the characteristics identified in 40 C.F.R. §§ 261.21-261.24 (2008). Pursuant to 40 C.F.R. § 261.3(b)(3) (2008), a solid waste mixture is subject to regulation as a hazardous waste when it exhibits any of the characteristics identified in 40 C.F.R. §§ 261.21-24 (2008).

225. During the June 2017 Inspection of the 10th Street Facility, EPA collected a representative sample of the contents of one or more drums or other containers of used 106 solvent. The representative sample from at least one such drum or other container was a liquid with a flash point below 140 degrees Fahrenheit.

226. On at least one occasion since June of 2017, a drum or other container of used 106 solvent that HCC received at the 10th Street Facility exhibited the characteristic of "ignitability" within the meaning of 40 C.F.R. § 261.21(a)(1) (2008), and was a "hazardous waste" within the meaning of 40 C.F.R. § 261.20(a) (2008).

227. At the time of the October 2019 Inspection of the 10th Street Facility, Tank 3 contained a mixture of used 106 solvent that HCC obtained from numerous different parts cleaning customers.

228. During the October 2019 Inspection, used 106 solvent was pumped from Tank 3 to an empty railcar in order to facilitate sampling of the contents of Tank 3. After pumping used 106 solvent from Tank 3 to such railcar, EPA collected a representative sample of the contents of that railcar.

229.    The sample referred to in Paragraph 228 was a liquid with a flash point less than 140 degrees Fahrenheit, determined in accordance with 40 C.F.R. § 261.21 (2008).

230.    The used 106 solvent in the railcar referred to in Paragraph 228 exhibited the characteristic of "ignitability" within the meaning of 40 C.F.R. § 261.21(a)(1) (2008), and was a "hazardous waste" within the meaning of 40 C.F.R. § 261.20(a) (2008).

231.    Based on the flashpoint of the used 106 solvent referred to in Paragraph 228, the contents of Tank 3 at the time of the October 2019 Inspection exhibited the characteristic of "ignitability" within the meaning of 40 C.F.R. § 261.21(a) (2008), and was a "hazardous waste" within the meaning of 40 C.F.R. § 261.20(a) (2008).

232.    At the time of the October 2019 Inspection, a sample of the used 106 solvent in the railcar referred to in Paragraph 228 was evaluated in accordance with 40 C.F.R. § 261.24(a) (2008), using SW-846 Test Method 1311. An extract from such sample obtained using SW-846 Test Method 1311 contained tetrachloroethylene in a concentration above 0.7 mg/L.

233.    Based on the tetrachloroethylene content of the used 106 solvent referred to in Paragraph 228, the contents of Tank 3 at the time of the October 2019 Inspection exhibited the characteristic of "toxicity" within the meaning of 40 C.F.R. § 261.24(a) (2008), and were a "hazardous waste" within the meaning of 40 C.F.R. § 261.20(a) (2008).

## 10TH STREET FACILITY CLAIMS FOR RELIEF

### Sixth Claim for Relief
### (Failure to Make Required Hazardous Waste Determinations)

234.    The allegations in Paragraphs 1–8, 10–26, 28, 36–49, and 170–233, above, are realleged and incorporated herein by reference.

235.    Pursuant to 40 C.F.R. § 262.11 (2008), HCC is required to determine whether solid wastes that it generates at the 10th Street Facility are hazardous wastes.

236.    Each time HCC combines used 106 solvent from different customers or sources as described in Paragraph 206, HCC creates a new mixture of used 106 solvent. The composition of such new solvent mixtures may differ from the composition of the individual drums or other containers of used 106 solvent originally received by HCC at the 10th Street Facility. Such new solvent mixtures are new "solid wastes," within the meaning of 40 C.F.R. § 261.2 (2008), generated by HCC at the 10th Street Facility.

237.    Each time HCC combines off-specification 106 solvent material from the Wolf Lake Terminal with used 106 solvent material in tanks at the 10th Street Facility as described in Paragraph 215, HCC creates a new mixture of used 106 solvent. Such new solvent mixtures are new "solid wastes," within the meaning of 40 C.F.R. § 261.2 (2008), generated by HCC at the 10th Street Facility.

238.    Each time HCC combines used 142 solvent from different customers or sources as described in Paragraph 181, HCC creates a new mixture of used 142 solvent. The composition of such new solvent mixtures may differ from the composition of the individual drums, other containers, or railcars of used 142 solvent originally received by HCC at the 10th Street Facility. Such new solvent mixtures are new "solid wastes," within the meaning of 40 C.F.R. § 261.2 (2008), generated by HCC at the 10th Street Facility.

239.    Each time HCC combines off-specification solvents from the vapor distillation column with used 142 solvent material in tanks at the 10th Street Facility as described in Paragraphs 183 and 185, HCC creates a new mixture of used 142 solvent. The composition of such new mixtures of used 142 solvent may differ from the composition of the individual drums, or other containers of used 142 solvent originally received by HCC at the 10th Street Facility.

Such new solvent mixtures are new "solid wastes," within the meaning of 40 C.F.R. § 261.2 (2008), generated by HCC at the 10th Street Facility.

240.     At the time of the June 2017 Inspection, HCC had not made a determination in accordance with the requirements of 40 C.F.R. § 262.11 (2008), as to whether any of the solid wastes referred to in Paragraphs 236 - 239, above, were hazardous wastes.

241.     At the time of the June 2017 Inspection, HCC had not tested the solid waste mixtures that were present in Tanks 3, 7, 16, and 17 in accordance with the methods set forth in 40 C.F.R. Part 261, Subpart C (2008), or an equivalent method approved by the Commissioner of IDEM under 40 C.F.R. § 260.21 (2008).

242.     At the time of the October 2019 Inspection, HCC had not made a determination in accordance with the requirements of 40 C.F.R. § 262.11) (2008), as to whether any of the solid wastes referred to in Paragraphs 236 - 239, above, were hazardous wastes.

243.     At the time of the October 2019 Inspection, HCC had not tested the solid waste mixtures that were present in Tanks 3, 7, 16, and 17 in accordance with the methods set forth in 40 C.F.R. Part 261, Subpart C (2008), or an equivalent method approved by the Commissioner of IDEM under 40 C.F.R. § 260.21 (2008).

244.     Prior to the June 2017 Inspection, HCC had not performed sufficient testing of different used solvent mixtures in Tanks 3, 7, 16, and 17 to determine that, regardless of any variability of the composition of drums or other containers of used solvent received from individual HCC customers, the used solvent mixtures generated by HCC in such tanks would not exhibit hazardous waste characteristics of ignitability or toxicity.

245.     Prior to the October 2019 Inspection, HCC had not performed sufficient testing of different used solvent mixtures in Tanks 3, 7, 16, and 17 to determine that, regardless of any

variability of the composition of drums or other containers of used solvent received from individual HCC customers, the used solvent mixtures generated by HCC in such tanks would not exhibit hazardous waste characteristics of ignitability or toxicity.

246.     As of the time of the June 2017 Inspection and the October 2019 Inspection, HCC did not possess sufficient information about the actual materials and processes used by each HCC customer that generated used 142 solvents received at the 10th Street Facility to know whether solid wastes generated by combining used solvents from different customers would exhibit characteristics of hazardous waste.

247.     As of the time of the June 2017 Inspection and the October 2019 Inspection, HCC did not possess sufficient information about the actual materials and processes used by each HCC customer that generated used 106 solvents received at the 10th Street Facility to know whether solid wastes generated by combining used solvents from different customers would exhibit characteristics of hazardous waste.

248.     Each instance in which HCC generated new solid wastes at the 10th Street Facility as described in Paragraphs 236 - 239, above, without making an accurate hazardous waste determination constitutes a violation of 40 C.F.R. § 262.11 (2008), which is incorporated by reference in the federally authorized hazardous waste management program for Indiana.

249.     HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA and Indiana Code Section 13-30-4-1 based on the acts or omissions alleged in this claim for relief.

250.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA. Pursuant to Indiana Code Section13-30-4-

1, HCC is currently subject to the assessment of civil penalties not to exceed $25,000 per day for each of the violations set forth above in this claim for relief.

### Seventh Claim for Relief
### (Storage of Hazardous Waste Without a Permit or Interim Status)

251.    The allegations in Paragraphs 1–8, 10–26, 28, 36–49, and 170–233, above, are realleged and incorporated herein by reference.

252.    Section 3005 of RCRA, 42 U.S.C. § 6925, Indiana Code Section 13-30-2-1(10), and 40 C.F.R. § 270.1 (2008), prohibit the treatment, storage, or disposal of hazardous waste by any person without a RCRA permit or interim status.

253.    At no time has HCC had a permit issued by IDEM pursuant to Section 3005 of RCRA, 42 U.S.C. § 6925, Indiana Code Section 13-30-2-1(10), 329 IAC 3.1-13-1 or 40 C.F.R. Part 270 (2008), authorizing HCC to treat, store, or dispose of hazardous waste at the 10th Street Facility.

254.    At no time has HCC applied for a permit to treat, store or dispose of hazardous waste at the 10th Street Facility, in accordance with 329 IAC 3.1-13-1, 40 C.F.R. Part 270 (2008) or Section 3005 of RCRA, 42 U.S.C. § 6925 and Indiana Code Section 13-30-2-1(10).

255.    At no time has HCC's 10th Street Facility qualified as an "interim status" facility under Section 3005(e) of RCRA, 42 U.S.C. § 6925(e), or 40 C.F.R. § 265.1(b) (2008).

256.    At the 10th Street Facility, HCC has, at various times since at least June of 2017, engaged in "storage" as defined in 40 C.F.R. §§ 260.10 and 270.2 (2008), of drums or other containers of used 106 solvent generated by HCC customers at locations other than the 10th Street Facility. Used 106 solvent in one or more such drums or containers exhibited hazardous waste characteristics and constituted hazardous waste.

257. At the 10th Street Facility, HCC has, at various times since at least June of 2017, engaged in "storage," as defined in 40 C.F.R. §§ 260.10 and 270.2 (2008), at the 10th Street Facility of drums or other containers of used 142 solvent generated by HCC customers at locations other than the 10th Street Facility. Used 142 solvent in one or more such drums or containers exhibited hazardous waste characteristics and constituted hazardous waste.

258. At the 10th Street Facility, HCC has, at various times since June of 2017, engaged in "storage," as defined in 40 C.F.R. §§ 260.10 and 270.2 (2008), at the 10th Street Facility of used 106 solvent in one or more tanks, including Tank 3. On one or more occasions since June of 2017, used 106 solvent in Tank 3 at the 10th Street Facility exhibited hazardous waste characteristics.

259. At the 10th Street Facility, HCC has, at various times since at least June of 2017, engaged in "storage," as defined in 40 C.F.R. §§ 260.10 and 270.2 (2008), at the 10th Street Facility of used 142 solvent in tanks, including Tank 7 and Tank 17. On one or more occasions since June of 2017, used 142 solvent in Tank 7 and Tank 17 at the 10th Street Facility exhibited hazardous waste characteristics.

260. As a result of the acts or omissions described above in this claim for relief, HCC violated Section 3005 of RCRA, 42 U.S.C. § 6925, and 40 C.F.R. § 270.1 (2008), which is incorporated by reference in the federally authorized hazardous waste management program for Indiana.

261. Each instance in which HCC stored hazardous waste at the 10th Street Facility without a permit or interim status constitutes a separate violation of Section 3005 of RCRA, 42 U.S.C. § 6925, Indiana Code Section 13-30-2-1 (10), and 40 C.F.R. § 270.1 (2008) which is

incorporated by reference in the federally authorized hazardous waste management program for Indiana.

262.    HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA and Indiana Code Section 13-30-4-1 based on the acts or omissions alleged in this claim for relief.

263.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA. Pursuant to Indiana Code Section 13-30-4-1, HCC is currently subject to the assessment of civil penalties not to exceed $25,000 per day for each of the violations set forth above in this claim for relief.

**Eighth Claim for Relief**
**(Failure to provide adequate secondary containment for hazardous waste storage tanks at the 10th Street Facility)**

264.    The allegations in Paragraphs 1–8, 10–26, 28, 36–49, 170–233, and 258–259, above, are realleged and incorporated herein by reference.

265.    Pursuant to 40 C.F.R. § 264.193(a) (2008), HCC is required to provide secondary containment for tank systems at the 10th Street Facility that store hazardous waste.

266.    "Tank system" is defined in 40 C.F.R. § 260.10 as a hazardous waste treatment or storage tank and its associated ancillary equipment and containment system.

267.    At the 10th Street Facility, HCC stores hazardous waste in one or more tanks, including Tank 3 and Tank 7. Each of these tanks is part of a "tank system" within the meaning of 40 C.F.R. §§ 260.10 and 264.193.

268.    The secondary containment systems around Tank 3 and Tank 7 at the 10th Street Facility do not comply with the requirements of 40 C.F.R. § 264.193.

269.     Among other things, 40 C.F.R. § 264.193 requires secondary containment systems to be designed, installed, and operated to prevent any migration of wastes or accumulated liquid out of the system to the soil, groundwater or surface water at any time during the use of the tank system.

270.     At the time of the October 2019 Inspection of the 10th Street Facility, the secondary containment system around Tank 3 had cracks in the bottom of the containment system. As a result, the containment system was not designed, installed, and operated by HCC in a manner sufficient to prevent any migration of wastes or accumulated liquids from the secondary containment system to underlying soils, groundwater, or surface waters.

271.     At the time of the June 2017 Inspection, the secondary containment system around Tank 7 consisted of soil, with no type of barrier that would prevent waste or accumulated liquids in the containment system from migrating into underlying soil, groundwater, or nearby surface waters. As a result, the containment system was not designed, installed, and operated by HCC in a manner sufficient to prevent any migration of wastes or accumulated liquids from the secondary containment system to underlying soils, groundwater, or surface waters.

272.     As a result of the acts or omissions referred to above in this claim for relief, HCC violated 40 C.F.R. § 264.193 (2008), which is incorporated by reference in the federally authorized hazardous waste management program for Indiana.

273.     HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA and Indiana Code Section 13-30-4-1 based on the acts or omissions alleged in this claim for relief.

274.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540

for each day of each violation of Subtitle C of RCRA. Pursuant to Indiana Code Section 13-30-4-1, HCC is currently subject to the assessment of civil penalties not to exceed $25,000 per day for each of the violations set forth above in this claim for relief.

<u>**Ninth Claim for Relief**</u>
**(Failing to control emissions from hazardous waste tanks)**

275.     The allegations in 1–8, 10–26, 28, 36–49, and 170–233, and 258–259, are realleged and incorporated herein by reference.

276.     At various times since at least June of 2017, HCC has owned or operated various "tanks" as defined in 40 C.F.R. § 260.10 (2008). Such tanks include tanks referred to by HCC as Tank 3, Tank 7, and Tank 17 at the 10th Street Facility.

277.     At various times since at least June of 2017, each of the tanks referred to in Paragraph 276, above, was part of a "tank system" as defined in 40 C.F.R. § 260.10 (2008).

278.     Since at least June of 2017, HCC has regularly stored used 106 solvent in Tank 3 at the 10th Street Facility.

279.     On one or more occasions since at least June of 2017, used 106 solvent that HCC stored in Tank 3 was hazardous waste.

280.     Since at least June of 2017, HCC has regularly stored used 142 solvent in Tank 7 at the 10th Street Facility.

281.     On one or more occasions since at least June of 2017, used 142 solvent that HCC stored in Tank 7 was hazardous waste.

282.     Since at least June of 2017, HCC has regularly stored in Tank 17 a material that HCC refers to as decant water that comes from other tanks, including Tank 16 at the 10th Street Facility.

283. On one or more occasions since at least June of 2017, the material stored in Tank 17 was hazardous waste.

284. At various times since at least June of 2017, Tank 3, Tank 7, and Tank 17 at the 10th Street Facility were each subject to 40 C.F.R. Part 264, Subpart J (2008).

285. Pursuant to 40 C.F.R. § 264.1080 (2008), the provisions of 40 C.F.R. Part 264, Subpart CC (2008) are applicable to each owner or operator of any tank subject to the requirements of 40 C.F.R. Part 264, Subpart J.

286. Owners or operators of tanks subject to 40 C.F.R. Part 264, Subpart CC (2008) must control air pollutant emissions from such tanks in accordance with applicable provisions of 40 C.F.R. § 264.1084 (2008), except in certain circumstances not relevant here.

287. Owners and operators of tanks that are subject to 40 C.F.R. § 264.1084 (2008) may elect to control air pollutant emissions from such tanks either by implementing Tank Level 1 controls specified in 40 C.F.R. § 264.1084(c) (2008) if the hazardous wastes managed in such tanks meet all of the conditions specified in 40 C.F.R. § 264.1084(b)(1)(i)-(iii) (2008) or by implementing Tank Level 2 controls specified in 40 C.F.R. § 264.1084(d) (2008).

288. Owners and operators of tanks that are subject to 40 C.F.R. § 264.1084 (2008) must implement Tank Level 2 controls specified in 40 C.F.R. § 264.1084(d) (2008)) to control air emissions from any such tanks that are used to manage hazardous wastes that do not meet all of the conditions specified in 40 C.F.R. § 264.1084(b)(1)(i)-(iii) (2008).

289. Since at least June of 2017, Tank 3, Tank 7, and Tank 17 at the 10th Street Facility were each equipped with a "fixed roof" as defined in 40 C.F.R. §§ 264.1081 and 265.1081 (2008). Each of these tanks has one or more openings that vent air pollutants to the atmosphere. Since at least June of 2017, Tanks 3, 7, and 17 each had at least one fixed roof opening that was

neither equipped with a "closure device" as defined in 40 C.F.R. §§ 264.1081 and 265.1081 (2008)) nor connected by a "closed vent system" to a "control device" meeting the requirements of 40 C.F.R. § 264.1087(b) and (c) (2008). Thus, Tanks 3, 7, and 17 did not satisfy Tank Level 1 control requirements, including the requirements specified in 40 C.F.R. § 264.1084(c)(2) (2008).

290.    Tank 3, Tank 7, and Tank 17 at the 10th Street Facility did not satisfy the Tank Level 2 control alternative specified in 40 C.F.R. § 264.1084(d)(3) and (g) (2008), because none of these tanks was vented through a closed vent system to a control device meeting the requirements of 40 C.F.R. § 264.1087(b) and (c) (2008).

291.    Since at least June of 2017, Tank 3, Tank 7, and Tank 17 at the 10th Street Facility each were not equipped with an "internal floating roof" as defined in 40 C.F.R. §§ 264.1081 and 265.1081 (2008). Thus, none of these tanks satisfy the Tank Level 2 control alternative specified in 40 C.F.R. § 264.1084(d)(1) and (e) (2008).

292.    Since at least June of 2017, neither Tank 3, Tank 7, nor Tank 17 at the 10th Street Facility has been equipped with an "external floating roof" as defined in 40 C.F.R. §§ 264.1081 and 265.1081 (2008). Thus, none of these tanks satisfy the requirements of the Tank Level 2 control alternative specified in 40 C.F.R. § 264.1084(d)(2) and (f) (2008).

293.    Tank 3, Tank 7, and Tank 17 at the 10th Street Facility are not "pressure tanks" within the meaning of 40 C.F.R. § 264.1084(d)(4) and (h) (2008). Thus, none of these tanks satisfies the requirements of the Tank Level 2 control alternative specified in 40 C.F.R. § 264.1084(d)(4) and (h) (2008).

294.    Tank 3, Tank 7, and Tank 17 at the 10th Street Facility are not located in an "enclosure" that is vented through a "closed-vent system" as those terms are defined in 40 C.F.R. §§ 264.1081 and 265.1081 (2008), to an enclosed combustion device. Thus, none of these tanks

satisfies the requirements of the Tank Level 2 control alternative specified in 40 C.F.R.

§ 264.1084(d)(4) and (i) (2008).

295.    At no time since June of 2017 has HCC controlled the emission of air pollutants

from Tank 3, Tank 7 or Tank 17 at the 10th Street Facility in the manner specified in

40 C.F.R. § 264.1084(b) (2008).

296.    Each instance in which HCC stored hazardous waste in Tank 3, Tank 7, or

Tank 17 at the 10th Street Facility without controlling the emission of air pollutants in a manner

authorized under 40 C.F.R. § 264.1084(b) (2008) constitutes a separate violation of

40 C.F.R. § 264.1084(b) (2008), which is incorporated by reference in the federally authorized

hazardous waste management program for Indiana.

297.    HCC is subject to injunctive relief and liable for civil penalties pursuant to

Section 3008 of RCRA and Indiana Code Section 13-30-4-1 based on the acts or omissions

alleged in this claim for relief.

298.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and

87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540

for each day of each violation of Subtitle C of RCRA. Pursuant to Indiana Code Section 13-30-4-

1, HCC is currently subject to the assessment of civil penalties not to exceed $25,000 per day for

each of the violations set forth above in this claim for relief.

### Tenth Claim for Relief
### (Failing to Maintain Records Supporting Determination Whether Equipment Is Subject to 40 C.F.R. Part 264, Subpart BB)

299.    The allegations in 1–8, 10–26, 28, 36–49, 170–233, and 256–259 are realleged

and incorporated herein by reference.

300.    Since at least June of 2017, HCC has regularly engaged in "treatment" or

"storage" of hazardous waste within the meaning of 40 C.F.R. Part 260.10 (2008), or both, in

various tanks or containers at the 10th Street Facility, including at various times Tank 3, Tank 7, Tank 16, Tank 17, and the containers referred to in Paragraphs 194 and 226.

301.    Since at least June of 2017, HCC has regularly managed used organic solvents, including used 106 solvent and used 142 solvent that exhibited hazardous waste characteristics, in various tanks and containers at the 10th Street Facility, including, at relevant times, tanks and containers referred to in Paragraph 300, as well as in the vapor distillation column referred to in Paragraph 183.

302.    As part of its management of the used solvents at the 10th Street Facility, HCC regularly adds used organic solvents to, or removes used organic solvents from, the tanks, containers and vapor distillation column referred to in Paragraph 301, above. In the course of moving organic solvent material into or out of such tanks, containers, and the vapor distillation column, the organic solvent materials come into contact with, or are contained, in various items of equipment, including, without limitation, various pumps, connectors, and valves.

303.    Pursuant to 40 C.F.R. § 264.1064(k)(3) (2008), HCC is required to record and maintain specified information, including an up-to-date analysis and supporting information and data used to determine whether the equipment referred to in Paragraph 302, above, is subject to the requirements of 40 C.F.R. §§ 264.1052-264.1060 (2008).

304.    Pursuant to 40 C.F.R. §§ 264.1064(k)(3) and 264.1063(d) (2008), HCC is required to determine the organic concentration of hazardous waste that comes into contact with the equipment referred to in Paragraph 302, in accordance with methods set forth in 40 C.F.R. § 264.1063(d)(1) and (2) (2008), and to maintain such information in a log that is kept as part of the operating record for the 10th Street Facility.

305.    HCC did not record and maintain all of the information referred to in Paragraphs 303 and 304.

306.    As a result of the acts or omissions referred to in Paragraph 305, above, HCC violated 40 C.F.R. §§ 264.1063(d) and 264.1064(k)(3) (2008), which are incorporated in the federally authorized hazardous waste management program for Indiana.

307.    HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA and Indiana Code Section 13-30-4-1 based on the acts or omissions alleged in this claim for relief.

308.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA. Pursuant to Indiana Code Section 13-30-4-1, HCC is currently subject to the assessment of civil penalties not to exceed $25,000 per day for each of the violations set forth above in this claim for relief.

### Eleventh Claim for Relief
### (Separate Claim of Indiana)
### (Violation of Prohibition on Accepting Hazardous Waste
### at Solid Waste Processing Facility)

309.    The allegations in paragraphs 1–8, 10–26, 28, 32–49, 170–233, 256–259, above, and paragraphs 483-484, below, are realleged and incorporated herein by reference.

310.    The Indiana Environmental Rules Board has promulgated rules relating to the operation and management of facilities that process and manage solid waste, at 329 IAC 11 *et seq.*

311.    Pursuant to 329 IAC 11-2-10.4, a "facility" means one or more permitted processing, storage, disposal, or operational units used for processing, storing in conjunction with processing or disposal, or disposing of solid waste.

312.    Pursuant to 329 IAC 11-2-15, "hazardous waste" means waste that is regulated under 329 IAC 3.1.

313.    Pursuant to 329 IAC 11-2-30, "processing" means (1) the method, system, or other handling of solid waste so as to change its chemical, biological, or physical form; (2) to render solid waste more amenable for disposal or recovery of materials or energy; or (3) the transfer of solid waste materials excluding the transportation of solid waste.

314.    Pursuant to Indiana Code Section 13-11-2-212, a "solid waste processing facility" means a facility at which at least one of the following is located:

****

(5) A resource recovery system.

315.    Beginning October 14, 2011, HCC was issued solid waste processing facility permit FP 49-60 for the 10th Street Facility, which authorized HCC to operate a facility to process, recycle, and transport only non-hazardous liquid solid waste, subject to the terms and enclosed requirements therein. The solid waste processing facility permit stated that the non-hazardous liquid solid waste "may be processed in a distillation column or bulked to facilitate off-site recycling or other treatment" and "does not include processing, recycling, and transport of hazardous waste regulated by 329 IAC 3.1."

316.    In the July 6, 2010 application for FP 49-60, HCC claimed that, with regard to the "142+ RCRA non-hazardous mineral spirits," it "processes non-hazardous solid waste in a distillation column."

317.    HCC has contended that neither the used 142 solvent nor the used 106 solvent it manages at the 10th Street Facility is a hazardous waste.

318.    On August 14, 2018, FP 49-60 for the 10th Street Facility was renewed. Condition C3 of the permit renewal stated that "[t]he permittee is approved to accept spent mineral spirit

solvents subject to the terms of this permit for recycling as described in documentation dated March 28, 2016." The March 28, 2016 document stated that in 1997, "a fractional distillation column was constructed on the site to recycle the 142+ RCRA non-hazardous mineral spirits parts cleaner solvent."

319.     329 IAC 11-3-2(b) states that "[h]azardous waste that is regulated by 329 IAC 3.1 must not be processed at any solid waste facility regulated under this article."

320.     329 IAC 11-8-2 states that "solid waste processing facilities may accept all solid waste regulated under this article except the following: (1) hazardous waste that is regulated by 329 IAC 3.1. (2) solid waste that is prohibited by the facility permit."

321.     329 IAC 11-13.5-5 states that "solid waste processing facilities may accept all solid waste regulated under this article except the following: (1) hazardous waste that is regulated by 329 IAC 3.1. (2) solid waste that is prohibited by the facility permit."

322.     Permit Condition A1 states "the permittee must comply with 329 IAC 11 except where alternative specification or requirements are noted in approved plans or this permit."

323.     Permit Condition A2 states "the permittee must operate and maintain the solid waste processing facility (facility) as described in the approved plans and specifications."

324.     Permit Condition C3 states "The permittee is approved to accept spent mineral spirit solvents subject to the terms of this permit for recycling as described in documentation dated March 28, 2016 (VFC#80265237)."

325.     Permit Condition C4 states "The permittee must not accept the following wastes under this permit:

a.     Hazardous waste as defined by 329 IAC 3.1

******

     f.     Conditionally Exempt Small Quantity Generator (CESQG) hazardous waste (329 IAC 11-2-5.3)."

326.     On numerous occasions, the used 142 solvent managed by HCC at the 10th Street Facility was hazardous waste within the meaning of 40 C.F.R. § 261.20(a) (2008).

327.     On one or more occasions used 106 solvent that HCC managed at the 10th Street Facility was hazardous waste within the meaning of 40 C.F.R. § 261.20(a) (2008).

328.     HCC's acceptance, management, storage and treatment of used 106 solvent and used 142 solvent that is a hazardous waste violates condition C4 (a) of the solid waste permit and 329 IAC 11-3-2; 329 IAC 11-8-2; and 329 IAC 11-13.5-5.

329.     HCC's acceptance, management, storage and treatment of 142 solvent that is a hazardous waste violates condition A2 of the solid waste permit because the solid waste processing facility permit was issued to allow only processing of non-hazardous 142 solvent.

330.     HCC's acceptance, management, storage and treatment of 142 solvent that is a hazardous waste violates condition C3 of the solid waste permit because the March 28, 2016 documentation described the 142 solvent as non-hazardous waste, and the permittee is not approved to accept 142 solvent that is a hazardous waste.

331.     HCC picked up hazardous waste from its customers and delivered the hazardous waste to the 10th Street Facility, which is a permitted solid waste processing facility but does not hold a hazardous waste permit from IDEM.

332.     Pursuant to Indiana Code Section 13-30-4-1, HCC is currently subject to the assessment of civil penalties not to exceed $25,000 per day for each violation of 329 IAC 11-3-2, 329 IAC 11-8-2 and 329 IAC 11-13.5-5, and for each violation of the solid waste processing facility permit for the 10th Street Facility, as set forth above in this claim for relief.

333. IDEM may recover a civil penalty in a civil action commenced in any court with jurisdiction and request in the action that the person is enjoined from continuing the violation. Indiana Code Section 13-30-4-1(b).

## DENVER FACILITY ALLEGATIONS

334. Since at least January of 2012, HCC has owned and/or operated what it refers to as a "branch facility" at 5221 Monroe Street, Denver, Colorado. This facility is hereinafter referred to as the "Denver Facility."

335. The Denver Facility is located in an industrial area, bounded to the north by a warehouse, Monroe Street to the east, another warehouse to the south, and unrelated industrial operations to the west.

336. Pursuant to Section 3010 of RCRA, 42 U.S.C. § 6930, HCC submitted a notification of hazardous waste activity to the Colorado Department of Public Health and Environment ("CDPHE") on or about December 11, 2011.

337. The Denver Facility was assigned EPA RCRA ID no. COR000226514.

### Management of used 142 solvent at the Denver Facility

338. HCC regularly transports to the Denver Facility drums or other containers of used 142 solvent that it picks up from certain of its parts cleaning customers located within a geographic area served by the Denver Facility. Once these drums or other containers are transported to the Denver Facility, HCC stores the used 142 solvent at the facility until it determines enough drums or other containers have been accumulated to warrant transport of such drums or containers to other locations, including an HCC facility in Kansas City, Kansas ("Kansas City Facility"), and on occasion to HCC's Shreveport Hub.

339. The used 142 solvent that HCC picks up from customers and delivers to the Denver Facility is a "spent material" within the meaning 6 CCR 1007-3 § 261.1(d)(1) (2012).

340.     Used 142 solvent drums or other containers picked up by HCC from its customers are transported by HCC to the Denver Facility under bills of lading. HCC subsequently transports the containers of used 142 solvent to HCC's Kansas City Facility and/or Shreveport Hub under the same bills of lading.

341.     The used 142 solvent drums or other containers transported from the Denver Facility to HCC's Kansas City Facility and/or Shreveport Hub are ultimately transported to HCC's 10th Street Facility where HCC reclaims the used 142 solvent as described above in Paragraphs 46 and 181 -187.

342.     The used 142 solvent received at the Denver Facility is a "solid waste" within the meaning of 6 CCR 1007-3 § 261.2 (2012).

343.     Pursuant to 6 CCR 1007-3 § 261.3 (2012), any solid waste exhibiting a characteristic of hazardous waste identified in Subpart C of Part 261 is a hazardous waste.

344.     EPA conducted a Compliance Evaluation Inspection at the Denver Facility on July 19, 2017 ("July 2017 Inspection"). During the July 2017 Inspection, the inspectors collected a separate representative sample from each of five different drums or containers of used 142 solvent generated by a single HCC customer.

345.     Each of the samples referred to in Paragraph 344, above, was evaluated in accordance with 6 CCR 1007-3 § 261.24(a) (2012), using SW-846 Test Method 1311. Extracts from three of the five samples obtained using SW-846 Test Method 1311 contained tetrachloroethylene in a concentration greater than or equal to 0.7 mg/L.

346.     At the time of the July 2017 Inspection, three of the five drums or containers referred to in Paragraph 344, above, contained used 142 solvent that exhibited the characteristic of toxicity within the meaning of 6 CCR 1007-3 § 261.24(a) (2012).

347.    At the time of the July 2017 Inspection, the used 142 solvent in three of the five

containers described in Paragraph 344, above, was hazardous waste within the meaning of 6

CCR 1007-3 § 261.20(a) (2012).

348.    The three drums of hazardous waste described in Paragraph 346, above, were

transported by HCC from the customer's premises to the Denver Facility under a bill of lading.

**DENVER FACILITY CLAIMS FOR RELIEF**

**Twelfth Claim for Relief**
**(Storage of Hazardous Waste Without a Permit or Interim Status)**

349.    The allegations in Paragraphs 1–8, 14–26, 29, 36–38, 40–47, and 334–348, above,

are realleged and incorporated herein by reference.

350.    Section 3005 of RCRA, 42 U.S.C. § 6925, and 6 CCR 1007-3 § 100.10 (2012)

prohibit the treatment, storage, or disposal of hazardous waste by any person without a RCRA

permit or interim status.

351.    At no time has HCC had a permit issued by CDPHE pursuant to Section 3005 of

RCRA, 42 U.S.C. § 6925, or 6 CCR 1007-3 § 100 (2012) authorizing HCC to treat, store, or

dispose of hazardous waste at the Denver Facility.

352.    At no time has HCC applied for a permit to treat, store, or dispose of hazardous

waste at the Denver Facility, in accordance with Section 3005 of RCRA, 42 U.S.C. § 6925,

and/or 6 CCR 1007-3 § 100 (2012).

353.    At no time has HCC's Denver Facility qualified as an "interim status" facility

under Section 3005(e) of RCRA, 42 U.S.C. § 6925(e), and/or 6 CCR 1007-3 § 265.1(b) (2012).

354.    At various times since at least the July 2017 Inspection, HCC has engaged in

"storage" as defined in 6 CCR 1007-3 § 260.10 (2012), at the Denver Facility of one or more

drums or other containers of used 142 solvent generated by HCC customers at locations other than the Denver Facility.

355.     On one or more occasions since at least 2017, HCC's activities at the Denver Facility have included "storage," as defined in 6 CCR 1007-3 § 260.10 (2012) of one or more drums or other containers of used 142 solvent that exhibited hazardous waste characteristics, including the drums described in Paragraphs 346 - 347, above.

356.     As a result of the acts or omissions described above in this claim for relief, HCC violated Section 3005 of RCRA, 42 U.S.C. § 6925 and 6 CCR 1007-3 § 100.10 (2012).

357.     Each instance in which HCC stored hazardous waste at the Denver Facility without a permit or interim status constitutes a violation of Section 3005 of RCRA, 42 U.S.C. § 6925 and 6 CCR 1007-3 § 100.10 (2012).

358.     HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA based on the acts or omissions alleged in this claim for relief.

359.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA.

## ATLANTA FACILITY ALLEGATIONS

360.     Since at least October 2017, HCC has operated a facility located at 6140 Purdue Dr., Atlanta, Georgia ("Atlanta Facility").

361.     At the Atlanta Facility, HCC receives and manages used solvents, including drums or other containers of used 142 solvent that HCC accepts from its parts washing customers in areas served by the Atlanta Facility. Such drums or other containers of used 142 solvent typically range in size from 30 to 55 gallons.

362.     Used 142 solvent that HCC receives at the Atlanta Facility is "spent material" within the meaning of 40 C.F.R. § 261.1(c)(1) (2016).

363.     Pursuant to Section 3010 of RCRA, HCC submitted a notification of hazardous waste activity to the Georgia Environmental Protection Division ("GAEPD") of the Georgia Department of Natural Resources on or about November 30, 2015. In that notification, HCC identified the Atlanta Facility as a RCRA large quantity generator of hazardous waste.

364.     The Atlanta Facility was assigned EPA RCRA ID no. GAR000078279.

365.     The used 142 solvent that HCC receives at the Atlanta Facility is a "solid waste" within the meaning of 40 C.F.R. § 261.2 (2016).

366.     Pursuant to 40 C.F.R. § 261.3(a)(2)(i) (2016), a solid waste is subject to regulation as a hazardous waste when it exhibits any of the characteristics identified in 40 C.F.R. §§ 260.21-24 (2016). Pursuant to 40 C.F.R. § 261.3(b)(3) (2016), a solid waste mixture is subject to regulation as a hazardous waste when it exhibits any of the characteristics identified in 40 C.F.R. §§ 261.21-24 (2016).

367.     EPA and GAEPD conducted a Compliance Evaluation Inspection of the Atlanta Facility on October 25, 2017 ("October 2017 Inspection"). During the week of March 20, 2018, EPA and GAEPD conducted a Case Development Investigation Evaluation of the Atlanta Facility that included collecting samples of the contents of various containers ("March 2018 Inspection").

<u>Management of used 142 solvent and solvent sludge at the Atlanta Facility</u>

368.     Since at least October of 2017, HCC has regularly transported to the Atlanta Facility drums or other containers of used 142 solvent that HCC picked up from certain of its parts cleaning customers located within a geographic area served by the Atlanta Facility.

369.    Individual drums or other containers of used 142 solvent received at the Atlanta Facility from different HCC customers may vary in composition, including differing amounts of water and other constituents.

370.    Since at least October of 2017, HCC regularly staged drums or other containers of used 142 solvent that it received at the Atlanta Facility in the facility's warehouse to allow the contents of the drums or other containers to separate into liquids and sludges.

371.    After allowing the contents of the drums or other containers to separate into liquids and sludges as described in Paragraph 370, above, HCC consolidates used 142 solvent liquids from drums or other containers of used 142 solvent that HCC received from numerous different customers by pumping the liquid fraction of such drums or other containers into railcars. Ultimately, such railcars transport these mixtures of used 142 solvent liquids to HCC's 10th Street Facility, where HCC reclaims the used 142 solvent liquids as described above in Paragraphs 46 and 181 -187.

372.    After transferring used 142 solvent to railcars as described in Paragraph 371, above, HCC at various relevant times, including during the October 2017 Inspection and March 2018 Inspection, stored the sludge remaining in each of the used 142 solvent drums or containers at the Atlanta Facility for varying periods of time. At relevant times, HCC consolidated the contents of such drums or containers, labeled the consolidated drums as hazardous waste D001, D006 and D008, and moved the drums or containers to an area of the Atlanta Facility that was designated for storage of hazardous waste.

373.    At the time of the October 2017 Inspection, the used 142 solvent sludges described in Paragraph 372, above, were stored in open drums or other containers.

374.    During the March 2018 Inspection, EPA collected representative samples from railcars at the Atlanta Facility.

375.    A representative sample of the used 142 solvent collected from one of the railcars during the March 2018 Inspection was evaluated in accordance with 40 C.F.R. § 261.24(a) (2016), using SW-846 Test Method 1311. An extract from the sample obtained using SW-846 Test Method 1311 contained tetrachloroethylene in a concentration greater than or equal to 0.7 mg/L.

376.    At the time of the March 2018 Inspection, the used 142 solvent in the railcar referred to in Paragraph 375, above, exhibited the characteristic of "toxicity" within the meaning of 40 C.F.R. § 261.24(a) (2016), and was a "hazardous waste" within the meaning of 40 C.F.R. § 261.20(a) (2016).

## ATLANTA FACILITY CLAIMS FOR RELIEF

### Thirteenth Claim for Relief
### (Failure to Make Required Hazardous Waste Determinations)

377.    The allegations in Paragraphs 1–8, 14–26, 30, 36–38, 40–47, and 360–376, above, are realleged and incorporated herein by reference.

378.    Pursuant to 40 C.F.R. § 262.11 (2016 and 2017), HCC has at all relevant times been required to determine whether solid wastes that it generates at the Atlanta Facility are hazardous wastes.

379.    Each time HCC combines used 142 solvent from different customers or sources, as described in Paragraph 371, HCC creates a new mixture of used 142 solvent. The composition of such new solvent mixtures may differ from the composition of the individual drums or other containers of used 142 solvent originally received by HCC at the Atlanta Facility. Such new

Complaint

Page 65

U.S, IN, & LDEQ v. Heritage-Crystal Clean, LLC,
Civil Action No. 1:22-cv-00303 (N.D. Il.)

solvent mixtures are new solid wastes generated by HCC, within the meaning of 40 C.F.R. § 261.2 (2016), generated by HCC at the Atlanta Facility.

380.     At the time of the October 2017 Inspection and the March 2018 Inspection, HCC had not made a determination in accordance with the requirements of 40 C.F.R. § 262.11 (2016) as to whether the solid waste referred to in Paragraph 379, above, was hazardous waste.

381.     As of the October 2017 Inspection and March 2018 Inspection, HCC did not determine whether used 142 solvent mixtures generated at the Atlanta Facility, including used solvent mixtures referred to in Paragraph 379, above, were hazardous waste based on testing such mixtures in accordance with methods set forth in 40 C.F.R. Part 261, Subpart C, or an equivalent method approved by the Director of GAEPD under 40 C.F.R. § 260.21 (2016).

382.     As of the October 2017 Inspection and the March 2018 Inspection, HCC had not performed sufficient testing of the used 142 solvent mixtures referred to in Paragraph 379, above, to determine that, regardless of any variability of the composition of drums or other containers of used 142 solvent received from individual HCC customers, such used 142 solvent mixture would not exhibit hazardous waste characteristics.

383.     As of the time of the March 2018 Inspection, HCC did not possess sufficient information about the actual materials and processes used by each HCC customer that generated used 142 solvents received at the Atlanta Facility to know whether used 142 solvent mixtures that HCC generates by consolidating used 142 solvent in railcars as described in Paragraph 379, above, would exhibit hazardous waste characteristics.

384.     Each instance prior to February 22, 2019 in which HCC generated new solid waste mixtures at the Atlanta Facility as described in Paragraph 379, above, without making an accurate hazardous waste determination constitutes a violation of 40 C.F.R. § 262.11 (2016),

which is incorporated by reference in the federally-authorized hazardous waste management program for Georgia. Each instance on or after February 22, 2019 in which HCC generated new solid waste mixtures at the Atlanta Facility as described in Paragraph 379, above, without making an accurate hazardous waste determination constitutes a violation of 40 C.F.R. § 262.11 (2017), which is incorporated by reference in the federally authorized hazardous waste management program for Georgia.

385.    HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA based on the acts or omissions alleged in this claim for relief.

386.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA.

**Fourteenth Claim for Relief**
**(Storage of Hazardous Waste without a Permit or Interim Status)**

387.    The allegations in Paragraphs 1–8, 14–26, 30, 36–38, 40–47, and 360–376, above, are realleged and incorporated herein by reference.

388.    Section 3005 of RCRA, 42 U.S.C. § 6925, Ga. Code Ann. § 12-8-66 and 40 C.F.R. § 270.1 (2016), prohibit the treatment, storage, or disposal of hazardous waste by any person without a RCRA permit or interim status.

389.    At no time has HCC had a permit issued by GAEPD pursuant to Section 3005 of RCRA, 42 U.S.C. § 6925, Ga. Code Ann. § 12-8-66, and/or 40 C.F.R. Part 270 authorizing HCC to treat, store, or dispose of hazardous waste at the Atlanta Facility.

390.    At no time has HCC applied for a permit to treat, store, or dispose of hazardous waste at the Atlanta Facility, in accordance with Section 3005 of RCRA, 42 U.S.C. § 6925, Ga. Code Ann. § 12-8-66, or 40 C.F.R. Part 270 (2016).

391.    At no time has the Atlanta Facility qualified as an "interim status" facility under Section 3005(e) of RCRA, 42 U.S.C. § 6925(e) and/or Ga. Code Ann. § 12-8-66(i).

392.    On one or more occasions since at least March 2018, HCC has engaged in "storage," as defined in 40 C.F.R. §§ 260.10 and 270.2 (2016), at the Atlanta Facility of liquid used 142 solvent mixtures that exhibited hazardous waste characteristics and constituted hazardous waste, including storage of the used 142 solvent mixture in the railcar referred to in Paragraphs 375-376.

393.    As a result of the acts or omissions described above in this claim for relief, HCC violated Section 3005 of RCRA, 42 U.S.C. § 6925, Ga. Code Ann. § 12-8-66, and 40 C.F.R. § 270.1 (2016), which is incorporated by reference in the federally authorized hazardous waste management program for Georgia.

394.    Each instance in which HCC stored hazardous waste at the Atlanta Facility without a permit or interim status constitutes a separate violation of Section 3005 of RCRA, 42 U.S.C. § 6925, GHWMA, Ga. Code Ann. § 12-8-66, and 40 C.F.R. § 270.1 (2016), which is incorporated by reference in the federally authorized hazardous waste management program for Georgia.

395.    HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA based on the acts or omissions alleged in this claim for relief.

396.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA.

**Fifteenth Claim for Relief**
**(Failure to Mark Equipment Subject to Subpart BB)**

397.     The allegations in Paragraphs 1–8, 14–26, 30, 36–38, 40–47, 360–376, and 392, above, are realleged and incorporated herein by reference.

398.     On one or more occasions since at least March of 2018, HCC engaged in "storage" of hazardous waste within the meaning of 40 C.F.R. § 260.10 (2016) in various containers at the Atlanta Facility, including the railcar referred to in Paragraph 392, above.

399.     On one or more occasions since at least March of 2018, HCC has managed hazardous waste with organic concentrations of at least 10 percent by weight in one or more of the containers referred to in Paragraph 392, above.

400.     As part of its management of used 142 solvent at the Atlanta Facility, on one or more occasions, HCC transferred hazardous waste with an organic concentration of at least 10 percent by weight from drums to railcars. During such transfers, hazardous waste with an organic concentration of at least 10 percent was contained in, or came into contact with, equipment as defined in 40 C.F.R. § 264.1031 (2016), including at least one pump, valve, and flange or other connector.

401.     At the time of the March 2018 Inspection, HCC had not marked all pieces of equipment at the Atlanta Facility that contained or came into contact with hazardous waste with organic concentrations of at least 10 percent by weight. Neither the pump nor the valves referred to in Paragraph 400, above, was marked in a manner to distinguish that equipment from other equipment at the Atlanta Facility that did not contain or come into contact with hazardous waste with an organic concentration of at least 10 percent by weight.

402.     By failing to mark the equipment referred to in Paragraph 400, above, in such a manner that it could be distinguished readily from other pieces of equipment, HCC violated

40 C.F.R. § 264.1050(d) (2016) which is incorporated by reference in the federally authorized hazardous waste management program for Georgia.

403.     HCC is liable for civil penalties pursuant to Section 3008 of RCRA based on the acts or omissions alleged in this claim for relief.

404.     Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA.

**Sixteenth Claim for Relief**
**(Failure to Maintain Records Supporting Documentation Whether Equipment is Subject to 40 C.F.R. Part 264, Subpart BB)**

405.     The allegations in Paragraphs 1–8, 14–26, 30, 36–38, 40–47, 360-376, and 392, above, are realleged and incorporated herein by reference.

406.     On one or more occasions since at least March of 2018, HCC has engaged in "storage" of hazardous waste within the meaning of 40 C.F.R. § 260.10 (2016) in various containers at the Atlanta Facility, including the railcar referred to in Paragraphs 375 and 376, above.

407.     On one or more occasions since at least March of 2018, HCC has managed used organic solvents, including the used 142 solvent mixtures that exhibited hazardous waste characteristics, in various containers at the Atlanta Facility, including, at relevant times, the railcar referred to in Paragraphs 375 and 376, above.

408.     As part of its management of the used 142 solvent at the Atlanta Facility, HCC regularly removes liquid organic solvents from drums or other containers of used 142 solvent that HCC receives at the Atlanta Facility and transfers such liquid organic solvents into railcars, as described in Paragraphs 371 and 379, above. In the course of such transfers of organic solvent material into railcars, the organic solvent material comes into contact with, or are contained in,

various items of equipment, including, without limitation, various pumps, valves and connectors. On one or more occasion since at least March of 2018, the organic solvent that HCC transferred into railcars was used 142 solvent that exhibited hazardous waste characteristics.

409.    Pursuant to 40 C.F.R. § 264.1064(k)(3) (2016), HCC is required to record and maintain specified information, including an up-to-date-analysis and supporting information and data used to determine whether the equipment referred to in Paragraph 408, above, is subject to the requirements of 40 C.F.R. §§ 264.1052-265.1060 (2016). Under 40 C.F.R. §§ 264.1064(k)(3) and 264.1063(d) (2016), HCC is required to determine the organic concentration of hazardous waste that comes into contact with the equipment referred to in Paragraph 408, in accordance with methods set forth in 40 C.F.R. § 264.1063(d)(1) and (2) (2016), and to maintain such information in a log that is kept as part of the operating record for the Atlanta Facility.

410.    HCC did not maintain records required pursuant to 40 C.F.R. § 264.1064(k)(3) (2016).

411.    As a result of the acts or omissions referred to above in this claim for relief, HCC violated 40 C.F.R. §§ 264.1063(d) and 264.1064(k)(3) (2016), which are incorporated in the federally authorized hazardous waste management program for Georgia.

412.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 per day for each violation of Subtitle C of RCRA alleged in this claim for relief.

## FAIRLESS HILLS FACILITY ALLEGATIONS

413.    From at least 2002 to July 2018, HCC operated a facility on approximately 2.5 acres of property leased by HCC at 199 Canal Road in Fairless Hills, Pennsylvania (hereinafter referred to as "the Fairless Hills Facility"). HCC's lease of the Fairless Hills Facility expired on

or about July 31, 2018, and HCC ceased operations at the Fairless Hills Facility on or about that time.

414.     Pursuant to Section 3010 of RCRA, on or about November 5, 2002, HCC submitted to the Pennsylvania Department of Environmental Protection ("PADEP") and EPA a notification of hazardous waste activity for the Fairless Hills Facility. In that notification, HCC identified the Fairless Hills Facility as a small quantity generator of hazardous waste. HCC later updated its notification to identify the Fairless Hills Facility as a large quantity generator of hazardous waste.

415.     The Fairless Hills Facility was assigned EPA RCRA ID no. PAR000507079.

416.     EPA and PADEP conducted a Compliance Evaluation Inspection of the Fairless Hills Facility on March 12-13, 2018 ("March 2018 Inspection"). As part of the inspection, EPA collected numerous samples, including samples of the contents of various drums or other containers at the Fairless Hills Facility.

<u>Management of used 106 solvent at the Fairless Hills Facility</u>

417.     From at least September 2007 until July 2018, HCC regularly delivered product 106 solvent to numerous different parts cleaning customers in a geographic area served by the Fairless Hills Facility, and HCC picked up drums or other containers of used 106 solvent from such parts washing customers and transported the used 106 solvent to the Fairless Hills Facility.

418.     After unloading the drums or other containers of used 106 solvent that arrived at the Fairless Hills Facility, HCC placed individual drums or other containers of used 106 solvent on a roller track system, and HCC pumped the used 106 solvent from each drum or other container into a railcar.

419.     After pumping used 106 solvent from drums or containers into a railcar as described in Paragraph 418, above, the drums or containers would regularly contain sludges or

other residual material. HCC would remove such sludge or other residual material from drums or containers by manually tipping such drums or containers and pouring their contents into a 55 gallon drum situated at the end of the roller track referred to in Paragraph 418, above. After the 55 gallon drum was filled with sludge and residual material from numerous used 106 drums, HCC would move the full drum to an area where HCC accumulated hazardous waste prior to offsite disposal at one or more hazardous waste treatment facilities.

420.    After filling a railcar with used 106 solvent pumped from drums or other containers as described in Paragraph 418, above, HCC regularly arranged for the railcar to transport the used 106 solvent to other facilities, including the Wolf Lake Terminal, where the used 106 solvent was subject to gravity separation as described in Paragraphs 425-427, below.

421.    After subjecting the used 106 solvent received at the Fairless Hills Facility to gravity separation as described in Paragraphs 425-427, below, HCC regularly re-sold the commercially valuable fraction of such used 106 solvent for use in various applications, including in roofing material applications.

422.    On a regular basis, the used 106 solvent received at the Fairless Hills Facility was not suitable for use in various resale applications, including roofing material applications, unless HCC altered the composition of such used 106 solvent by, among other things, reducing the aqueous content of the used 106 solvent until it met applicable product specifications.

423.    HCC regularly subjected used 106 solvent that it received at the Fairless Hills Facility to gravity separation and the removal of predominantly aqueous material and solids prior to resale of such used 106 solvent. As described below in Paragraphs 425-427, this gravity separation and removal of aqueous material and solids took place, at whole or in part, in locations other than the Fairless Hills Facility.

424. At the time of the March 2018 Inspection, HCC's regular practice was to arrange to ship the railcars of used 106 solvent from the Fairless Hill Facility to other facilities, including a facility in Indianapolis and a facility at the Wolf Lake Terminal, about once a month. At the Wolf Lake Terminal, shipments of HCC's used 106 solvent material from various locations, including the Fairless Hills Facility and the 10th Street Facility, were pumped from railcars into one or more tanks that HCC leased from Wolf Lake Terminals, Inc. At the Wolf Lake Terminal, newly arrived shipments of HCC used 106 solvent mixtures were regularly combined with used 106 solvent material that HCC had previously placed in tanks at the Wolf Lake Terminal.

425. At the Wolf Lake Terminal, HCC stored used 106 solvent material, including used 106 solvent received from the Fairless Hills Facility in its leased tanks for periods of time that ranged from one to three weeks, in order to allow the material to separate into different layers or phases, with denser, predominantly aqueous material and solids settling to the bottom of a tank or container, and less dense, predominantly solvent material collecting at the top of the tank or container.

426. After HCC's used 106 solvent, including used 106 solvent from the Fairless Hills Facility was allowed to separate into different layers or phases in tanks at the Wolf Lake Terminal, solvent material drawn from the top of HCC's tanks at the Wolf Lake Terminal was pumped into tanker trucks. At relevant times, such solvent material was either (i) transported to HCC's 10th Street Facility, sampled, and managed as described in Paragraph 215, above, or (ii) sampled at the Wolf Lake Terminal to determine whether the material met product specifications for resale of the solvent. If the solvent material sampled at the Wolf Lake Terminal met HCC's product specifications for resale solvent, the resale solvent could be shipped directly from the Wolf Lake Terminal to resale solvent customers. If solvent material sampled at the Wolf Lake

Terminal did not meet HCC product specifications for resale solvent, during relevant periods the solvent was further managed in HCC's tanks at the Wolf Lake Terminal.

427.     As a result of the management of used 106 solvent described in Paragraphs 425-426, above, HCC removed a substantial volume of water and solids from the used 106 solvent, including used 106 solvent that HCC received at the Fairless Hills Facility.

428.     Used 106 solvent that HCC received at the Fairless Hills Facility was "spent material" within the meaning of 40 C.F.R. § 261.1(c)(1) (2005) because HCC's parts cleaning customers had used the 106 solvent prior to returning the used solvent to HCC, and the used solvent that HCC picked up from its customers was not suitable for use as a parts cleaning product.

429.     The used 106 solvent that HCC received at the Fairless Hills Facility was "reclaimed" within the meaning of 40 C.F.R. § 261.1(c)(4) (2005), prior to any resale of such solvent, because the gravity separation process described in Paragraphs 425-426, above, was necessary for HCC to recover a usable product from such used 106 solvent.

430.     Materials such as used 106 solvent that are reclaimed are "recycled" within the meaning of 40 C.F.R. § 261.1(c)(7) (2005).

431.     The used 106 solvent received at the Fairless Hills Facility constituted "discarded material" within the meaning of 40 C.F.R. § 261.2(a)(2) (2005).

432.     The used 106 solvent received at the Fairless Hills Facility constituted "solid waste" within the meaning of 40 C.F.R. § 261.2(a)(1) (2005).

433.     Pursuant to 40 C.F.R. § 261.20 (2005), a solid waste is subject to regulation as a hazardous waste when it exhibits any of the characteristics identified in 40 C.F.R. §§ 261.21-261.24 (2005). Pursuant to 40 C.F.R. § 261.3(b)(3) (2005), a solid waste mixture is subject to

regulation as a hazardous waste when it exhibits any of the characteristics identified in 40 C.F.R. §§ 261.21-24 (2008).

434.    During the March 2018 Inspection, EPA collected a representative sample of the contents of each of four drums of used 106 solvent at the Fairless Hills Facility.

435.    Each of the representative samples referred to in Paragraph 434, above, was a liquid with a flash point below 140 degrees Fahrenheit, determined in accordance with 40 C.F.R. § 261.21 (2005).

436.     The used 106 solvent in each of the four drums referred to in Paragraph 434, above, exhibited the characteristic of "ignitability" within the meaning of 40 C.F.R. § 261.21(a)(1) (2005), and was a "hazardous waste" within the meaning of 40 C.F.R. § 261.20(a) (2005).

437.    During the March 2018 Inspection at the Fairless Hills Facility, EPA collected a representative sample from a railcar that contained a used 106 solvent mixture that HCC created by consolidating used 106 solvent liquids as described in Paragraph 418, above.

438.    The representative sample referred to in Paragraph 437, above, was a liquid with a flash point below 140 degrees Fahrenheit, determined in accordance with 40 C.F.R. § 261.21 (2005).

439.    The used 106 solvent in the railcar referred to in Paragraph 437, above, exhibited the characteristic of "ignitability" within the meaning of 40 C.F.R. 261.21(a)(1) (2005), and was a "hazardous waste" within the meaning of 40 C.F.R. § 261.20(a) (2005).

440.    At the time of the March 2018 Inspection, a sample of the used 106 solvent in the railcar referred to in Paragraph 437, above, was evaluated in accordance with 40 C.F.R. § 261.24(a) (2005), using SW-846 Test Method 1311. An extract from such sample obtained

using SW-846 Test Method 1311 contained tetrachloroethylene in a concentration above 0.7 mg/L.

441.　An extract from the sample referred to in Paragraph 440, above, obtained using SW-846 Test Method 1311, contained trichloroethylene at a concentration greater than or equal to 0.5 mg/L.

442.　At the time of the March 2018 Inspection, the used 106 solvent in the railcar referred to in Paragraph 437, above, exhibited the characteristic of "toxicity" within the meaning of 40 C.F.R. § 261.24(a) (2005), and was a "hazardous waste" within the meaning of 40 C.F.R. § 261.20(a)(2) (2005).

## FAIRLESS HILLS FACILITY CLAIMS FOR RELIEF

### Seventeenth Claim for Relief
### (Failure to Make Required Hazardous Waste Determinations)

443.　The allegations in Paragraphs 1–8, 14–26, 31, 36–38, 40–45, 48–49, 413–442, above, are realleged and incorporated herein by reference.

444.　Pursuant to 40 C.F.R. § 262.11 (2005), HCC is required to determine whether solid wastes that it generates at the Fairless Hills Facility are hazardous wastes.

445.　Each time HCC combined used 106 solvent from different customers or sources by pumping 106 solvent from different customers or sources into railcars as described in Paragraphs 418, above, HCC created a new mixture of used 106 solvent. The composition of such new solvent mixtures may differ from the composition of the individual drums or other containers of used 106 solvent originally received by HCC at the Fairless Hills Facility. Such new solvent mixtures are new "solid wastes," within the meaning of 40 C.F.R. § 261.2 (2005), generated by HCC at the Fairless Hills Facility.

446.     At the time of the March 2018 Inspection, HCC had not made a determination in accordance with the requirements of 40 C.F.R. § 262.11 (2005) as to whether the solid wastes generated as described in Paragraph 445, above, were hazardous wastes.

447.     As of the March 2018 Inspection, HCC had not determined whether used 106 solvent mixtures generated at the Fairless Hills Facility, including used solvent mixtures in the railcars referred to in Paragraph 437, above, were hazardous waste based on testing such mixtures in accordance with methods set forth in 40 C.F.R. Part 261, Subpart C, or an equivalent method approved by the Secretary of PADEP under 40 C.F.R. § 260.21 (2005).

448.     As of the March 2018 Inspection, HCC had not performed sufficient testing of different used 106 solvent mixtures referred to in Paragraph 445, above, to determine that, regardless of any variability of the composition of drums or other containers of used 106 solvent received from individual HCC customers, the used 106 solvent mixtures generated by HCC would not exhibit the hazardous waste characteristics of ignitability and/or toxicity.

449.     As of the time of the March 2018 Inspection, HCC did not possess sufficient information about the actual materials and processes used by each HCC customer that generated used solvents received at the Fairless Hills Facility to know whether the solid wastes generated by combining used solvents from different customers would exhibit the characteristics of hazardous waste.

450.     Each instance in which HCC generated new solid wastes at the Fairless Hills Facility as described in Paragraph 445, above, without making an accurate hazardous waste determination constitutes a violation of 40 C.F.R. § 262.11 (2005) which is incorporated by reference in the federally authorized hazardous waste management program for Pennsylvania.

451.    HCC is liable for civil penalties pursuant to Section 3008 of RCRA based on the acts or omissions alleged in this claim for relief.

452.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA.

### Eighteenth Claim for Relief
### (Storage of Hazardous Waste without a Permit or Interim Status)

453.    The allegations in Paragraphs 1–8, 14–26, 31, 36–38, 40–45, 48–49, 413–442, above, are realleged and incorporated herein by reference.

454.    Section 3005 of RCRA, 42 U.S.C. § 6925, and 40 C.F.R § 270.1 (2005), prohibit the treatment, storage, or disposal of hazardous waste by any person without a RCRA permit or interim status.

455.    At no time had HCC had a permit issued by PADEP pursuant to Section 3005 of RCRA, 42 U.S.C. § 6925, or 40 C.F.R § 270.1 (2005), authorizing HCC to treat, store, or dispose of hazardous waste at the Fairless Hills Facility.

456.    At no time has HCC applied for a permit to treat, store or dispose of hazardous waste at the Fairless Hills Facility, in accordance with 40 C.F.R Part 270 (2005) and/or Section 3005 of RCRA, 42 U.S.C. § 6925.

457.    At no time has HCC's Fairless Hills Facility qualified as an "interim status" facility under Section 3005(e) of RCRA, 42 U.S.C. § 6925(e), and/or 40 C.F.R § 265.1(b) (2005).

458.    At various times from at least March 2018 until July 2018, HCC has engaged in "storage," as defined in 25 Pa. Code § 260a.10 (2009), of one or more drums or other containers of used 106 solvent generated by HCC customers at locations other than the Fairless Hills

Facility. Used 106 solvent in one or more drums or containers stored by HCC at the Fairless Hills Facility exhibited hazardous waste characteristics and constituted hazardous waste.

459.    At various times from at least March 2018 until July 2018, HCC has engaged in "storage," as defined in 25 Pa. Code § 260a.10 (2009), at the Fairless Hills Facility of used 106 solvent mixtures, including storage of used solvent mixtures in railcars. On one or more occasions, such used solvent mixtures exhibited hazardous waste characteristics and constituted hazardous waste.

460.    As a result of the acts or omissions described above in this claim for relief, HCC violated Section 3005 of RCRA, 42 U.S.C. § 6925, and 40 C.F.R § 270.1 (2005).

461.    Each instance in which HCC stored hazardous waste at the Fairless Hills Facility without a permit or interim status constitutes a separate violation of Section 3005 of RCRA, 42 U.S.C. § 6925, and 40 C.F.R § 270.1 (2005) which is incorporated by reference in the federally authorized hazardous waste management program for Pennsylvania.

462.    HCC is liable for civil penalties pursuant to Section 3008 of RCRA based on the acts or omissions alleged in this claim for relief.

463.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA.

### Nineteenth Claim for Relief
### (Failure to Mark Equipment Subject to Subpart BB)

464.    The allegations in Paragraphs 1–8, 14–26, 31, 36–38, 40–45, 48–49, 413–442, and 458–459, above, are realleged and incorporated herein by reference.

465.    On one or more occasions from at least March 2018 until July 2018, HCC engaged in "storage" of hazardous waste within the meaning of 40 C.F.R. § 260.10 (2005) in

various containers at the Fairless Hills Facility, including the drums referred to in Paragraphs 434-436, above, and the railcar referred to in Paragraphs 437-442, above.

466.     On one or more occasions since at least March of 2018, HCC has managed hazardous waste with organic concentrations of at least 10 percent by weight in one or more of the containers referred to in Paragraph 465, above.

467.     As part of its management of used 106 solvent at the Fairless Hills Facility, on one or more occasions, HCC transferred hazardous waste with an organic concentration of at least 10 percent by weight from drums to railcars. During such transfers, hazardous waste with an organic concentration of at least 10 percent was contained in, or came into contact with, equipment as defined in 40 C.F.R. § 264.1031 (2005), including at least one pump and two valves.

468.     Pursuant to 40 C.F.R. § 264.1050(d) (2005), each owner or operator of a facility that stores hazardous waste must mark equipment that contains or contacts hazardous wastes with organic concentrations of at least 10 percent by weight in such a manner that it can be distinguished readily from other pieces of equipment.

469.     At the time of the March 2018 Inspection, HCC had not marked all pieces of equipment at the Fairless Hills Facility that contained or came into contact with hazardous waste with organic concentrations of at least 10 percent by weight. Neither the pump nor the valves referred to in Paragraph 467, above, were marked in a manner to distinguish them from other equipment at the Fairless Hills Facility that did not contain or come into contact with hazardous waste with an organic concentration of at least 10 percent by weight.

470.     By failing to mark the equipment referred to in Paragraph 469, above, in such a manner that it could be distinguished readily from other pieces of equipment, HCC violated

40 C.F.R. § 264.1050(d) (2005) which is incorporated by reference in the federally authorized hazardous waste management program for Pennsylvania.

471.    HCC is liable for civil penalties pursuant to Section 3008 of RCRA based on the acts or omissions alleged in this claim for relief.

472.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA.

**Twentieth Claim for Relief**
**(Failure to Maintain Records Supporting Determination Whether Equipment Is**
**Subject to 40 C.F.R. Part 264, Subpart BB)**

473.    The allegations in Paragraphs 1–8, 14–26, 31, 36-38, 40–45, 48–49, 413–442, 458–459, and 465–467, above, are realleged and incorporated herein by reference.

474.    Pursuant to 40 C.F.R. § 264.1064(k)(3) (2005), HCC is required to record and maintain specified information, including an up-to-date analysis and supporting information and data used to determine whether the equipment referred to in Paragraph 467, above, is subject to the requirements of 40 C.F.R. §§ 264.1052-264.1060 (2005).

475.    Pursuant to 40 C.F.R. §§ 264.1064(k)(3) and 264.1063(d) (2005), HCC is required to determine the organic concentration of hazardous waste that comes into contact with the equipment referred to in Paragraph 467, above, in accordance with methods set forth in 40 C.F.R. § 264.1063(d)(1) and (2) (2005), and to maintain such information in a log that is kept as part of the operating record for the Fairless Hills Facility.

476.    HCC did not record and maintain at the Fairless Hills Facility all of the information referred to in Paragraphs 474 and 475.

477.    As a result of the acts or omissions referred to in Paragraph 476, above, HCC violated 40 C.F.R. §§ 264.1063(d) and 264.1064(k)(3) (2005) which is incorporated by reference in the federally authorized hazardous waste management program for Pennsylvania.

478.    HCC is liable for civil penalties pursuant to Section 3008 of RCRA based on the acts or omissions alleged in this claim for relief.

479.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA.

**UNMANIFESTED HAZARDOUS WASTE SHIPMENTS - MULTIPLE LOCATIONS**

### Twenty-first Claim for Relief
### (Unmanifested Shipments of Hazardous Waste)

480.    The allegations in 1–31, 36–39, 54, 59, 72–74, 80, 94–97, 179, 191–194, 204–205, 225-226, 338, 340-341, 344–348, 368, 371, 374–376, 417–418, 420, 434–442, above, are realleged and incorporated herein by reference.

### Used Solvents Generated at the Atlanta Facility

481.    HCC regularly generates more than 1000 kilograms of hazardous waste per month at the Atlanta Facility.

482.    40 C.F.R. § 262.20(a) (2016) generally requires hazardous waste generators who transport hazardous waste for off-site treatment, storage, or disposal, or who offer hazardous waste for transportation for offsite treatment, storage, or disposal, to prepare a hazardous waste manifest in accordance with requirements specified in that regulation for each such hazardous waste shipment.

483.    On one or more occasions since at least March 2018, HCC has transported used 142 solvent mixtures generated at the Atlanta Facility to HCC's 10th Street Facility for treatment,

storage or disposal, or HCC has offered such used 142 solvent mixtures for transportation to HCC's 10th Street Facility for treatment, storage or disposal.

484. On one or more occasions the used 142 solvent mixtures referred to in Paragraph 483, above, exhibited one or more hazardous waste characteristics.

485. HCC did not prepare uniform hazardous waste manifests for any shipments of used 142 solvent mixtures from the Atlanta Facility to HCC's 10th Street Facility, including shipment of the mixture referred to in Paragraphs 375 and 376, above.

486. As a result of the acts or omissions referred to in Paragraphs 483 - 485, above, HCC violated 40 C.F.R. § 262.20(a) (2016). Each instance in which HCC transported, or offered for transport, hazardous waste mixtures generated at the Atlanta Facility to HCC's 10th Street Facility without a hazardous waste manifest constitutes a separate violation of 40 C.F.R. § 262.20(a) (2016).

<u>Used Solvents Generated at the Fairless Hills Facility</u>

487. HCC regularly generated more than 1000 kilograms of hazardous waste per month at the Fairless Hills Facility.

488. 40 C.F.R. § 262.20(a) (2005) generally requires hazardous waste generators who transport hazardous waste for off-site treatment, storage, or disposal, or who offer hazardous waste for transportation for offsite treatment, storage, or disposal, to prepare a hazardous waste manifest in accordance with requirements specified in that regulation for each such hazardous waste shipment.

489. From at least March 2014 until July 2018, HCC regularly transported used 106 solvent mixtures generated at the Fairless Hills Facility for offsite treatment, storage or disposal at various facilities, including an HCC facility in Indianapolis and the Wolf Lake Terminal, or

HCC offered such used solvent mixtures for transport for offsite treatment, storage or disposal at various facilities, including an HCC Facility in Indianapolis and the Wolf Lake Terminal.

490.    On one or more occasions, the used 106 solvent mixtures referred to in Paragraph 489, above, contained hazardous waste.

491.    In transporting or arranging for transport of used 106 solvent from the Fairless Hills Facility to the Wolf Lake terminal, it was not HCC's practice to prepare hazardous waste manifests for such shipments. On one or more occasions, HCC transported, or offered for transport, hazardous waste mixtures from the Fairless Hills Facility, including the used 106 solvent mixture referred to in Paragraph 437, to offsite facilities, without preparing hazardous waste manifests for such shipments.

492.    As a result of the acts or omissions referred to in Paragraphs 491, above, HCC violated 40 C.F.R. § 262.20(a) (2005), which is incorporated in the federally authorized hazardous waste management program for Pennsylvania. Each instance in which HCC transported, or offered for transport hazardous waste mixtures generated at HCC's Fairless Hills Facility without a hazardous waste manifest constitutes a separate violation of 40 C.F.R. § 262.20(a) (2005).

<u>Used Solvents Generated by HCC Customers</u>

493.    In each of the states where HCC does business with parts cleaning customers, applicable provisions of the federally authorized hazardous waste management program include requirements generally prohibiting transporters from accepting hazardous waste from a generator, unless such hazardous waste is accompanied by a manifest signed in accordance with requirements of such federally authorized hazardous waste management program (40 C.F.R. § 263.20).

494.     Since at least November of 2015, HCC has regularly accepted used 142 solvent and used 106 solvent from HCC parts cleaning solvent customers at various locations throughout the United States, including customers in Louisiana, Indiana, and Colorado.

495.     After accepting used solvents from its parts cleaning customers, HCC has regularly transported such used solvents to various HCC branch and hub facilities, including the Shreveport Hub and the 10th Street Facility, without hazardous waste manifests.

496.     On one or more occasions, the used solvents shipments referred to in Paragraph 495, above, included used 142 solvent and used 106 solvent that exhibited hazardous waste characteristics of ignitability or toxicity.

497.     By accepting one or more shipments referred to in Paragraph 496 without hazardous waste manifests, HCC violated applicable requirements of federally-authorized hazardous waste management programs for each state where HCC accepted such shipments, including requirements of LAC 33:V.1307 (2014); 40 C.F.R. § 263.20 (2008), which is incorporated in the federally-authorized hazardous waste management program in Indiana; and 6 CCR 1007-3 § 263.20 (2012).

498.     Each such instance in which HCC accepted hazardous waste from HCC parts cleaning customers in Louisiana without a hazardous waste manifest constituted a separate violation of LAC 33:V.1307 (2014). Each such instance in which HCC accepted hazardous waste from HCC parts cleaning customers in Indiana without a hazardous waste manifest constituted a separate violation of 40 C.F.R. § 263.20 (2008), which is incorporated in the federally authorized hazardous waste management program for Indiana. Each such instance in which HCC accepted hazardous waste from HCC parts cleaning customers in Colorado without a hazardous waste manifest constituted a separate violation of 6 CCR 1007-3 § 263.20 (2012).

499.    As a result of the acts or omissions referred to in this claim for relief, HCC is subject to injunctive relief and liable for civil penalties pursuant to Section 3008 of RCRA, La. R.S. 30:2025, and Indiana Code Section 13-30-4-1.

500.    Pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), 40 C.F.R. § 19.4, and 87 Fed. Reg. 1676 (Jan. 12, 2022), HCC is currently subject to civil penalties of up to $81,540 for each day of each violation of Subtitle C of RCRA.

501.    Pursuant to Indiana Code Section 13-30-4-1, HCC is currently subject to the assessment of civil penalties not to exceed $25,000 per day for each violation of Subtitle C of RCRA alleged in this claim for relief.

502.    Pursuant to La. R.S. 30:2025, HCC is currently subject to the assessment of civil penalties not to exceed $32,500 per day for each violation of LAC 33:V.1307.A (2014) set forth above in this claim for relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, the United States, Louisiana Department of Environmental Quality and the state of Indiana, respectfully request that this Court:

1.    Order the Defendant pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), La. R.S. 30:2025, and Indiana Code Sections 13-14-2-6 and 13-30-4-1, to take all actions appropriate to assure compliance with applicable provisions of each federally authorized hazardous waste management program referred to in this Complaint, including all statutory and regulatory requirements cited in this Complaint;

2.    Assess civil penalties against the Defendant pursuant to 3008(g) of RCRA, 42 U.S.C. § 6928(g), La. R.S. 30:2025, and Indiana Code Sections 13-14-2-6 and 13-30-4-1, for up to the maximum amounts provided by law for each violation of applicable statutory and regulatory requirements cited in this Complaint; and

3.      Grant the United States, Louisiana Department of Environmental Quality, and State of Indiana such other relief as this Court deems just and proper.

AND WHEREFORE, Plaintiff, the state of Indiana, respectfully requests that this Court further:

4.      Order the Defendant, pursuant to Indiana Code Section 13-30-4-1, to take all actions necessary to assure that Defendant's 10th Street Facility complies with statutory and regulatory requirements applicable to solid waste processing facilities, including terms and conditions of the solid waste processing facility permit issued for the 10th Street Facility; and

5.      Assess civil penalties against the Defendant pursuant to Indiana Code Section 13-30-4-1, for up to the maximum amounts provided by law, for each violation at the 10th Street Facility of statutory and regulatory requirements applicable to solid waste processing facilities, including violations of the terms and conditions of the solid waste processing facility permit issued for the 10th Street Facility.

Respectfully submitted,

CIVIL COMPLAINT: United States et al. v. Heritage-Crystal Clean, LLC

FOR THE UNITED STATES OF AMERICA:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

s/ Michael T. Donellan
MICHAEL T. DONNELLAN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 514-4113
Email: Michael.donnellan@usdoj.gov

s/ Steven J. Willey
STEVEN J. WILLEY
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 514-2807
Email: Steven.Willey@usdoj.gov

s/ Laura K. Welles
LAURA K. WELLES
Trial Attorney by Special Appointment
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 532-5556
Email: Laura.Welles@usdoj.gov

CIVIL COMPLAINT: <u>United States et al. v. Heritage-Crystal Clean, LLC</u>

                                  FOR THE UNITED STATES OF AMERICA:

                                    JOHN R. LAUSCH, JR.
                                    United States Attorney
                                    Northern District of Illinois

                                    <u>s/ Kurt Lindland</u>
                                    KURT LINDLAND
                                    Assistant United States Attorney
                                    Northern District of Illinois
                                    219 South Dearborn Street, 5th Floor
                                    Chicago, IL  60604
                                    Phone: 312-353-4163
                                    Email: Kurt.Lindland@usdoj.gov

<u>OF COUNSEL FOR THE UNITED STATES OF AMERICA</u>:

Nathaniel N. Moore
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA  94105

Maria E. Gonzalez
Associate Regional Counsel
U.S. EPA Region 5
77 West Jackson Blvd.
Chicago, IL  60604

Jeffrey S. Nast
Sr. Assistant Regional Counsel
U.S. EPA – Region III
1650 Arch Street
Philadelphia, PA  19103

Joan Redleaf Durbin
Senior Attorney
RCRA/FIFRA/TSCA Law Office
US EPA, Region 4
61 Forsyth Street, SW
Atlanta, GA  30303

Charles L. Figur
Senior Assistant Regional Counsel
Legal Enforcement Branch (8ORC-R)
U. S. Environmental Protection Agency Region 8
1595 Wynkoop Street
Denver, CO  80202-1129

CIVIL COMPLAINT: United States et al. v. Heritage-Crystal Clean, LLC

FOR THE LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY:


JEFF LANDRY
Attorney General
State of Louisiana


By:    <u>Ryan M. Seidmann</u>
        Ryan M. Seidemann (La. #28991; Vt. #6170)
        Assistant Attorney General
        Louisiana Department of Justice
        1885 North Third Street
        Baton Rouge, LA  70802
        Phone: (225) 326-6000
        Telefax: (225) 326-6099
        Email: seidemannr@ag.louisiana.gov

CIVIL COMPLAINT: <u>United States et al. v. Heritage-Crystal Clean, LLC</u>

FOR THE STATE OF INDIANA:


THEODORE E. ROKITA
Attorney General of Indiana


|  | By: | <u>Patricia Orloff Erdmann</u> |
|---|---|---|

Date  Patricia Orloff Erdmann
Chief Counsel for Litigation
Office of Attorney General Todd Rokita
302 West Washington Street
IGCS-5th Floor
Indianapolis, IN 46204
Phone: 317.232.6318
Telefax: 317.232.7979
Email: patricia.erdmann@atg.in.gov